

Nourse & Bowles, LLP
One Exchange Plaza
New York, New York 10006
(212) 952-6200
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                  :

EUKOR CAR CARRIERS, INC.,        :

                    Plaintiff,     :      COMPLAINT

     - against -           :

DONGBU INSURANCE CO., LTD.    :

                 Defendant.    :
-------------------------------------------------------X

## JURISDICTION AND VENUE

1.     This action constitutes an admiralty and maritime claim within the meaning

of Rule 9(h) of the Federal Rules of Civil Procedure and is within the admiralty and

maritime jurisdiction of this Court pursuant to 28 U.S.C. 1333.

2.     This is an action for declaratory judgment filed under and pursuant to 28

U.S.C. 2201, 2202, the Federal Declaratory Judgment Act, for the purposes of

determining an actual controversy of a justiciable nature as more fully appears hereafter.

3.     Venue is proper by virtue of a binding forum selection clause contained in

an ocean bill of lading contract of carriage, as more fully discussed herein.

## PARTIES

4.    Plaintiff Eukor Car Carriers, Inc. ("Eukor") is a corporation organized and existing under the laws of the country of the Republic of Korea, with its principal place of business located at 736-1 Yeoksam-Dong, Kangnam-Gu, Seoul, 135-983, Korea. Eukor is engaged in the business of common carriage of merchandise by water for hire and was the charterer of the vessel GRAND QUEST.

5.    Defendant Dongbu Insurance Co., Ltd. ("Dongbu") is a corporation organized and existing pursuant to the laws of the country of the Republic of Korea, with its principal place of business located at 432 Teheran-no, Gangnam-Gu, Seoul, Korea, and an office and place of business in the State of New York, located at 1010 Northern Blvd., Suite 238, Great Neck, New York 11021.  Dongbu is registered with the New State Department of Financial Services.  Dongbu is the subrogated marine insurance underwriter of  Doosan Infracore America Corporation ("Doosan America"), as receiver/consignee of the subject cargo shipped to the United States by Doosan Infracore Co., Ltd. ("Doosan"), as shipper.

## RELATED ACTION

6.    Wallenius Wilhelmsen Logistics, A.S. and Wallenius Wilhelsen Lines A.S. (collectively "WWL"), are freight forwarders, cargo logistics service providers and/or common carriers which issued bills of lading contracts to Doosan and Doosan America in connection with the cargo that is the subject this action.  Upon information and belief, WWL will be filing a related action against Defendant Dongbu seeking the same relief as

2

sought herein by Plaintiff Eukor. The terms and conditions of WWL's bill of lading contracts are at issue in these related actions, and the core legal issues to be decided with respect to the WWL bills of lading and the cargo claims arising out of the subject voyage are the same in both actions.

## **FACTS**

7.      This is an action to enforce a mandatory and exclusive forum selection and choice of law clause (hereafter "Choice of Forum Clause") contained in an ocean bill of lading contract issued by WWL to the benefit of Plaintiff Eukor as the underlying carrier, which vests exclusive jurisdiction over claims arising from these shipments in the United States District Court for the Southern District of New York. The Choice of Forum Clause further mandates that the United States Carriage of Goods by Sea Act (1936), 46 U.S.C. §13701, et. seq. ("U.S. COGSA") and United States law shall apply.

8.   The Choice of Forum Clause states:

> 13. CHOICE OF FORUM
>
> All disputes arising from shipments to or from the United States will be decided only by the United States District Court for the Southern District of New York, in New York, in New York City. This court has exclusive jurisdiction over such disputes. The general law of the United States, in addition to the law specified in Clause 9 of this bill of lading, will apply to these disputes. All other disputes will be decided by the High Court, London, UK, which will have exclusive jurisdiction over those disputes. The general law of England will apply to those disputes in addition to the law specified in Clause 9 of this bill of lading. No proceedings may be brought before any other forum or tribunal.

9.  Plaintiff Eukor is compelled to seek declaratory relief enforcing the bill of lading contract and Choice of Forum Clause as Defendant Dongbu, the subrogated underwriter and/or assignee of Doosan and Doosan America, breached that contract by commencing a lawsuit against Plaintiff Eukor and WWL in the Republic of Korea (hereafter "Korean Action") seeking damages in the amount of $2,340,384.08, plus "delay interest" at a rate of 20% per annum, for alleged cargo loss and damage arising out of the voyage.  The complaint in the Korean Action was served on Eukor on September 25, 2012.  Plaintiff Eukor seeks an Order enjoining Dongbu from proceeding with the Korean Action.  A copy of the complaint in the Korean Action is attached hereto as Exhibit "1".

10.  Defendant Dongbu also breached the WWL bill of lading contract by filing on or about August 30, 2012 an Application for Arbitration proceeding against Plaintiff Eukor and WWL in the Republic of Korea before the Korean Arbitration Board (hereafter "Korean Arbitration").  A copy of the Application for Arbitration in the Korean Arbitration is attached hereto as Exhibit "2".  That arbitration has now been withdrawn in response to a joint request by counsel for Eukor and WWL.

11.  Dongbu, as the subrogated underwriter "standing in the shoes" of its insureds, is bound by the terms and conditions of the WWL bill of lading contract, including the Choice of Forum Clause and the provisions calling for the application of U.S. law and U.S. COGSA.  The Korean Action and the Korean Arbitration were commenced by Dongbu in breach of that contract.

4

12.     The Korean Action and Korean Arbitration were commenced in an effort to "forum shop" and evade a U.S. forum and the application of U.S. law and U.S. COGSA, which limits the recoverable damages to USD 500 per "package". As reflected in Exhibits 1 and 2, the damages sought in the Korean Action and Korean Arbitration vastly exceed the maximum recovery permissible under U.S. law and U.S. COGSA.

13.     Plaintiff Eukor therefore seeks a declaration that the Choice of Forum Clause contained in the WWL bill of lading is binding and enforceable, that any claims for alleged cargo loss or damage against Plaintiff Eukor must proceed in this Court, that U.S. law and U.S. COGSA apply to such cargo claims, and that Plaintiff Eukor is entitled to limit its liability to USD 500 per "package" under U.S. COGSA.

14.     Plaintiff Eukor also seeks an Order enjoining Defendant Dongbu, as the subrogated underwriter and/or assignee of Doosan and Doosan America, from prosecuting the Korean Action, and from reviving or refiling the Korean Arbitration, together with all damages resulting from Dongbu's breach of the bill of lading contract, including all legal fees and costs.

15.     Plaintiff Eukor also seeks an Order awarding punitive damages against Defendant Dongbu as a result of Dongbu's bad faith.

*CONTRACTS OF CARRIAGE*

16.     Plaintiff Eukor is the charterer of the vessel GRAND QUEST. On or about April 30, 2010, Eukor as "Actual Carrier" entered into a service contract (hereafter

"Ocean Carrier Contract" or "OCC") with Doosan, as "Shipper", and WWL, as "Carrier", with respect to volumes and rates for shipments of Doosan's products from Korea to its affiliates worldwide, including Doosan America.  A copy of the OCC is annexed hereto as Exhibit "3".

17.     By executing the OCC, Eukor, WWL and Doosan agreed that the WWL bill of lading terms and conditions shall be used for all shipments under the OCC and would govern the rights and obligations of all of the parties to the OCC. (Clause 11 of the OCC, Exhibit "3").

18.     Eukor, WWL and Doosan further agreed that "any matter not specified in this [Ocean Carrier] Contract shall be governed by the clauses of the Carrier's [WWL] bill of lading." (Clause 16 of the OCC, Exhibit "3").

19.     Eukor, WWL and Doosan also agreed that the transportation services provided by Eukor would be governed by the WWL bill of lading, as set out in Clause 8 of the OCC:

8.  RESPONSIBILITY OF CARRIER

Actual Carrier shall be responsible for the equipment and machine tools from ramp end to ramp end basis.  Actual Carrier shall be responsible for the safe transportation of the equipment and machine tools and Actual Carrier shall, as soon as possible, notify Shipper regarding the occurrence of any special circumstances, including occurrence of any damage, loss or destruction of the equipments and machine

> tools *while providing its transportation services according to Carrier's Bill of Lading.*

(Emphasis added).  (Clause 8, Exhibit "3").

20.     On or about July 27, 2011, WWL issued two bills of lading (No. KR1131949 and No. KR1131944) on the required WWL bill of lading standard form as agreed in the OCC.  Copies of the WWL bills of lading, with terms and conditions, are attached hereto as Exhibit "4".

21.     The referenced bills of lading identify Doosan as the "shipper" and Doosan America as the "consignee/notify party".  Each bill of lading describes the shipment as "22 cases" of "CNC Lathe & Machining Center" for ocean transit aboard the GRAND QUEST from Ulsan, South Korea to Newark, New Jersey. Each bill of lading lists "22" under the "No. of units or pkgs." column.  Under both bills of lading, a total of 44 "units" or "packages" were shipped.

22.     The terms and conditions on the back of the WWL bill of lading contain a Clause Paramount applying U.S. law and U.S. COGSA to all shipments to or from the United States, including the subject voyage.

23.     Clause 10 of the WWL bill of lading limits the "carrier's" liability to $500 per package:

> If U.S. COGSA applies to the contract evidenced by this bill of lading, the Carrier's liability is limited to U.S. $500 per package, or for Goods not shipped in packages, per customary freight unit, unless a higher value is declared in the Declared

> Value box on the face of the bill of lading and a higher freight
> is paid.  Each unpackaged vehicle or other piece of
> unpackaged cargo on which freight is calculated, constitutes
> one customary freight unit.

(Clause 10, Exhibit "4").

24.    Clause 10 of the WWL bill of lading is consistent with the U.S. COGSA

"package" limitation which provides:

> Neither the carrier nor the ship shall in any event be or
> become liable for any loss or damage to or in connection with
> the transportation of goods in an amount exceeding $500 per
> package lawful money of the United States, or in case of
> goods not shipped in packages, per customary freight unit, or
> the equivalent of that sum in other currency, unless the nature
> and value of such goods have been declared by the shipper
> before shipment and inserted in the bill of lading.  This
> declaration, if embodied in the bill of lading, shall be prima
> facie evidence, but shall not be conclusive on the carrier.

46 U.S.C. §30701, et. seq., Sec. 4(5).

25.    The terms and conditions of the WWL bill of lading further contain a

mandatory and exclusive forum selection clause requiring that all claims for cargo loss or

damage be brought in the United States District Court for the Southern District of New

York, with U.S. law to apply:

> 13. CHOICE OF FORUM
>
> All disputes arising from shipments to or from the United
> States will be decided only by the United States District Court
> for the Southern District of New York, in New York, in New
> York City.  This court has exclusive jurisdiction over such
> disputes.  The general law of the United States, in addition to
> the law specified in Clause 9 of this bill of lading, will apply

> to these disputes.  * * * No proceedings may be brought
> before any other forum or tribunal.

(Clause 13, Exhibit "4").


26.     Thereafter, on or about July 27, 2011, Eukor issued its own bills of lading

("sea waybills") numbered KR 1131944W and KR 1131949W to WWL for carriage of

the subject shipment.  Each waybill identifies Wallenius Wilhelmsen Logistics Korea as

the "shipper" and Wallenius Wilhelmsen Logistics Americas LLC as the "consignee" and

"notify party", and similarly apply U.S law and U.S. COGSA to all shipments to or from

the United States.  The Eukor waybills govern the relationship between Eukor and WWL

with respect to the shipments.

*ALLEGED CARGO LOSS AND DAMAGE*

27.     On or about July 28, 2011, the subject cargo was loaded aboard the

GRAND QUEST and the vessel departed South Korea en route to the United States.  The

vessel was expected to arrive in Newark in late August, 2011, around the same time that

Hurricane Irene was predicted to reach the New York area.

28.     On or about August 29, 2011, the vessel arrived at the Bayonne Auto

Terminal in New Jersey and commenced discharging the subject cargo for delivery to

Doosan America.

29.     In the Korean Action, Defendant Dongbu contends that 21 of 44 "cases"
sustained loss and/or damage during the voyage as a result of the vessel's encounter with
Hurricane Irene.

*LAWSUIT AND DEMAND FOR ARBITRATION IN KOREA*

30.     On or about August 30, 2012, Defendant Dongbu, as the purported
subrogated underwriter and/or assignee of Doosan and Doosan America, commenced the
Korean Action against WWL and Eukor alleging, among other things, breach of the
WWL bill of lading contracts and seeking recovery for alleged loss and/or damage to the
subject shipment.

31.     On or about August 30, 2012, Defendant Dongbu, as the purported
subrogated underwriter and/or assignee of Doosan and Doosan America, commenced the
Korean Arbitration against WWL and Eukor by service of an Application for Arbitration
before the Korean Arbitration Board, alleging, among other things, breach of the WWL
bill of lading contracts and seeking recovery for alleged loss and/or damage to the subject
shipment.

32.     Both the Korean Action and the Korean Arbitration were commenced in
violation of the terms and conditions of the WWL bill of lading contracts mandating that
claims arising from shipments to or from the United States can only be brought in this
Court, with U.S. law and U.S. COGSA to apply.

33.     Dongbu has withdrawn the Korean Arbitration, but has not discontinued the

Korean Action despite demands that it do so.

## FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT

34.     Plaintiff repeats and realleges each and every allegation set forth above in

paragraphs 1 to 33, inclusive, as if fully set forth at length herein.

35.     The contracts of carriage governing the shipment were issued by WWL to

Doosan and consigned to the order of Doosan America.  Both Doosan and Doosan

America accepted, and are contractually bound by, the terms and conditions of the WWL

bill of lading contracts containing a mandatory and exclusive forum selection and choice

of law clause which provides in relevant part:

> 13. CHOICE OF FORUM
>
> All disputes arising from shipments to or from the United
> States will be decided only by the United States District Court
> for the Southern District of New York, in New York, in New
> York City.  This court has exclusive jurisdiction over such
> disputes.  The general law of the United States, in addition to
> the law specified in Clause 9 of this bill of lading, will apply
> to these disputes... No proceedings may be brought before
> any other forum or tribunal.

(Clause 13, Exhibit "4").

36.     The WWL bill of lading contracts further mandate that United States law is

to apply to all disputes arising from shipments to or from the United States. Both the

Choice of Forum Clause (quoted above) and Clause 9(a) of the WWL bill of lading

11

expressly state that if the cargo covered by the bill of lading contract is carried to or from the United States, then U.S. law and the provisions of U.S. COGSA apply. Clause 9(a) states in relevant part:

> 9. APPLICABLE LIABILITY REGIME
>
> (a) If this bill of lading evidences a contract of carriage to or from the United States, it is governed by the United States Carriage of Goods by Sea Act, . . .

37.     Plaintiff Eukor is a party to, and entitled to the protections of, the full terms and conditions contained in the bill of lading contracts issued by WWL, including the Choice of Forum Clause and the choice of law provisions, by virtue of the Sub-Contractors and Himalaya Clause ("Himalaya Clause") which provides:

> 15. SUB-CONTRACTORS AND HIMALAYA CLAUSE
>
> The Carrier may sub-contract, directly or indirectly, the whole or any part of the contract of carriage on any terms. The parties to this bill of lading intend to extend its terms and conditions, including all defenses and limitations, to all parties who participate in its performance. The defenses, limitations, and the law governing this bill of lading with the force of law or incorporated by reference into this bill of lading shall extend to all parties that agree directly or indirectly with the carrier to perform all or any part of the contract of carriage. These parties shall include, but shall not be limited to, the following entities: underlying carriers, participating land carriers, stevedores, terminal operators, watching services, vessel operators, voyage charterers, time charterers, slot or space charterers, direct and indirect sub-contractors, independent contractors, and every servant or agent of the Carrier or of a subcontractor. For the purpose of this Clause, the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of such persons to who the terms and conditions of this bill of lading

12

> are extended and each of them and all such persons and each
> of them shall to this extent be or be deemed to be parties to
> this bill of lading.

(Clause 15, Exhibit "4").

38.     As a party to the WWL bill of lading contract, and as an "underlying

carrier," Eukor is entitled to all rights and defenses under the bill of lading contract,

including the right to enforce the terms and conditions of the Choice of Forum Clause

providing for the mandatory and exclusive jurisdiction of this Court and the application

of United States law and U.S. COGSA.

39.     Accordingly, this Court should declare that the Choice of Forum Clause

requires that any and all claims with respect to alleged damage to or loss of the subject

shipments be brought in this Court; that Defendant Dongbu, along with any other party, is

precluded from commencing or continuing any proceeding in any other court or tribunal;

that United States law and U.S. COGSA apply to any such claims; and that Plaintiff

Eukor is entitled to the benefit of the Choice of Forum Clause.

## **SECOND CAUSE OF ACTION – INJUNCTIVE RELIEF**

40.     Plaintiff repeats and reasserts each and every allegation set forth above in

paragraphs 1 to 39, inclusive, as if fully set forth at length herein.

41.     The Choice of Forum Clause contained in the WWL bill of lading contracts

mandates that "[a]ll disputes arising from shipments to or from the United States will be

decided only by the United States District Court for the Southern District of New York,

13

in New York, in New York City", to the exclusion of all other forums or tribunals. (Clause 13, Exhibit "4").

42.     Notwithstanding the express provisions of the bill of lading contracts, Defendant Dongbu, as the purported subrogated underwriter and/or assignee of Doosan and Doosan America, filed an action against Eukor and WWL in a Korean court seeking recovery of damages for alleged cargo loss and damage under Korean law in direct violation of the contract of carriage and its choice of forum and choice of law provisions.

43.     Notwithstanding the express provisions of the bill of lading contracts, Defendant Dongbu filed an Application for Arbitration against Eukor and WWL in Korea seeking recovery of damages for alleged cargo loss and damage under Korean law in direct violation of the contract of carriage and its choice of forum and choice of law provisions.  Upon information and belief, the Korean Arbitration has been withdrawn in response to a demand by Plaintiff Eukor and WWL.

44.     Accordingly, Plaintiff Eukor seeks a declaration that Defendant Dongbu, as the subrogated underwriter and/or assignee of Doosan and Doosan America, is in breach of the terms and conditions of the bill of lading contracts, including the Choice of Forum Clause.  Plaintiff Eukor further seeks an Order which enjoins Defendant Dongbu, along with any other party, from proceeding in and/or prosecuting the Korean Action and further enjoins any act to refile or reopen the Korean Arbitration in violation of the bill of lading's mandatory and exclusive Choice of Forum Clause.

### THIRD CAUSE OF ACTION – BREACH OF CONTRACT

45.     Plaintiff repeats and reasserts each and every allegation set forth above in paragraphs 1 to 44, inclusive, as if fully set forth at length herein.

46.     Defendant Dongbu's breach of the terms and conditions of the bill of lading contracts exposes Plaintiff Eukor to potential liability under Korean law and in a Korean forum, which may exceed any maximum recovery to which Defendants may be otherwise entitled (which is denied) under United States law and U.S. COGSA, as awarded by a U.S. court.

47.     Defendant Dongbu's breaches of the terms and conditions of the bill of lading contracts has also caused and continues to cause Plaintiff Eukor to incur costs and expenses associated with defending itself in the improper forum, with respect to both the Korean Action and the Korean Arbitration.

48.     Accordingly, Plaintiff Eukor is entitled to an award of damages for breach of the bill of lading contracts, including but not limited to the recovery of all sums that Plaintiff Eukor may become obligated to pay in Korea which exceed Eukor's maximum liability for cargo loss or damage under U.S. law and U.S. COGSA, plus costs incurred by Eukor in defending itself in the improperly filed Korean Action and/or Korean Arbitration, together with all related costs, expenses, damages and legal fees.

## FOURTH CAUSE OF ACTION –
## DECLARATION THAT PLAINTIFF IS NOT LIABLE

49.    Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 48, inclusive, as if fully set forth at length herein.

50.    Defendant Dongbu, as the subrogated underwriter and/or assignee of Doosan and Doosan America, alleges in the Korean Action and Korean Arbitration that the subject cargo sustained loss and/or damage in the amount of $2,340,384.08, which is denied, and that it is entitled to recover such sum plus "delay interest" at a rate of 20% per annum.

51.    Any loss or damage which may have occurred – which is denied - arose or resulted from insufficiency of packing, or from inherent defect, quality or vice of the shipment, or by act or omission of the shippers or owners of the shipments, their agents or representatives, and Plaintiff Eukor is under no liability for any such loss or damage.

52.    Alternatively, any loss or damage which may have occurred – which is denied – arose or resulted from an act, neglect, or fault of, the Master, or the servants of the vessel owner in the navigation and/or management of the vessel, and/or occurred as a result of the fault or neglect of other third parties for whom Eukor is not responsible, and Eukor is not under any liability for any such loss or damage.

53.    Alternatively, any loss or damage which may have occurred – which is denied – occurred without the actual fault or privity of Plaintiff Eukor, and without the

actual fault or neglect of Eukor's agents, servants or employees or anyone for whom Eukor was responsible.

54.     Accordingly, Plaintiff Eukor seeks a declaration that Eukor is not under any liability for loss or damage to the subject cargo.

### FIFTH CAUSE OF ACTION – DECLARATION THAT EUKOR'S LIABILITY IS LIMITED TO $500 PER PACKAGE

55.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 54, inclusive, as if fully set forth at length herein.

56.     Defendant Dongbu, as the subrogated underwriter and/or assignee of Doosan and Doosan America, claims that 21 "cases" or units of cargo were lost and/or damaged during the voyage.

57.     In the event that Plaintiff Eukor is found liable for any loss or damage to the subject cargo, which is denied, then any recovery by Dongbu must be computed in accordance with the terms of the contracts of carriage and the provisions of the U.S. COGSA, and can in no event exceed $500. per package or customary freight unit.

58.     Accordingly, Plaintiff Eukor seeks a declaration that any recovery for cargo loss and/or damage in this instance cannot exceed $10,500 (21 x $500 per package).

### SIXTH CAUSE OF ACTION – BAD FAITH

59.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 58, inclusive, as if fully set forth at length herein.

60.     The actions of Defendant Dongbu, as the subrogated underwriter and/or assignee of Doosan and Doosan America, in commencing the Korean Action and the Korean Arbitration in violation of the Choice of Forum Clause and other terms and conditions of the bill of lading contracts, and its continued refusal to withdraw and/or discontinue the Korean Action, are willful and vexatious and intended solely to circumvent the proper application of U.S. law and U.S. COGSA.

61.     By pursuing the Korean Action, Defendant Dongbu seeks to evade the applicable limitations of liability under U.S. COGSA which Plaintiff Eukor is entitled to assert.

62.     The actions of Defendant Dongbu in commencing the Korean Action and Korean Arbitration in a forum that may not recognize and apply U.S. law and U.S. COGSA is willful, egregious and malicious and exposes Eukor and WWL to substantial expense and costs in defending the Korean Action, and exposes Eukor and WWL to potential liability far in excess of the maximum liability permitted under U.S. law and U.S. COGSA.  Prior to the withdrawal of the Korean Arbitration, Eukor was exposed to, and incurred, costs in connection with the defense of that Arbitration.

63.     These actions by Defendant Dongbu entitle Plaintiff Eukor to an award of punitive damages, together with all attorneys' fees and costs, as a result of the Dongbu's willful, egregious and malicious misconduct.

WHEREFORE, Plaintiff Eukor Car Carriers, Inc. demands judgment against Defendant Dongbu as follows:

(a)     Declaratory judgment that any and all claims with respect to alleged damage to or loss of the subject shipment be brought in this Court, that Defendant Dongbu, as well as Doosan and Doosan America, are precluded from commencing or continuing any proceeding in any other court or tribunal, that U.S. law and U.S. COGSA apply to any such claims, and that Plaintiff Eukor is entitled to the benefit of the WWL bill of lading Choice of Forum Clause;

(b)     Declaratory judgment that Defendant Dongbu is in breach of the terms and conditions of the WWL bill of lading contracts, including the Choice of Forum Clause, and is enjoined from proceeding in and/or prosecuting the Korean Action and from refiling or reopening the Korean Arbitration;

(c)     Judgment against Defendant Dongbu for the full amount of damages caused by its breach of the bill of lading contracts, including but not limited to the recovery of all sums that Plaintiff Eukor may become obligated to pay in Korea which exceed Plaintiff's maximum liability for cargo loss or damage under U.S. law and U.S. COGSA, plus costs incurred by Plaintiff in defending itself in the improperly filed Korean Action and/or Korean

Arbitration, together with all related costs, expenses, damages and legal fees;

(d) Declaratory judgment that Eukor is not under any liability for loss or damage to the subject cargo;

(e) Declaratory judgment that any recovery for cargo loss and/or damage with respect to the subject shipments cannot exceed $10,500 (21 x $500 per package);

(f) Judgment against Defendant Dongbu for punitive damages, together with all attorneys' fees and costs.

(g) Such further relief as is just and proper.

Dated:    New York, New York
          November 5, 2012

                    NOURSE & BOWLES, LLP
                    Attorneys for Plaintiff
                    Eukor Car Carriers, Inc.

          By

                    Michael E. Crowley, Esq.
                    Julia M. Moore, Esq.
                    One Exchange Plaza
                    At 55 Broadway, 30th Floor
                    New York, New York 10006-3030
                    (212) 952-6200
                    Email: mcrowley@nb-ny.com

# Exhibit 1

*Exhibit 1*

Trans/U101-1121_complaint_120927

[Translation]

## Complaint

Plaintiff      Dongbu Insurance Co., Ltd.

432 Teheran-no, Gangnam-gu, Seoul

Jeong Nam Kim, Representative Director

Legal representatives for Plaintiff

Sung Keuk Cho, Attorney at law

Seug Hee Yoon, Attorney at law

Yong June Kim, Attorney at law

Dong Hyun Kim, Attorney at law

5 Fl. Rock Bldg. 58-4 Banpo-4dong, Seocho-gu, Seoul (137-803)

Tel: 02)592-5790, Fax: 02)592-5793

Defendants    **1. Wallenius Wihelmsen Logistics SA**

Strandveien 12, N-1366 Laysaker, Norway

Arild Iversen, Representative Director

Korean Branch

10 Fl. Seoul Newpapers Bldg. 25 Tapyeongno-1ga, Jung-gu, Seoul (157-280)

Seong Eun Kang, Representative in Korea

**2. Eukor Car Carriers Co., Ltd.**

13 Fl. Capital Tower 736-1 Yeoksam-dong, Gangnam-gu, Seoul (135-808)

Representative Direcotr Sure Galtung

**Complaint in respect of claim for indemnity**

### Tenor of the Claim

We pray for that:

1.   Defendants shall jointly and severally pay Plaintiff KRW2,532,295,574 plus interest accruing at 6% per annum from 31 December 2011 until the date of receipt of this Complaint and at 20% per annum therefrom until the date of full payment.

2.   Costs for lawsuit shall be borne by Defendants.

3.   The paragraph 1 can be provisionally enforced.

## Grounds for the Claim

### 1.   Status of the Parties

Plaintiff is a company doing business in providing marine insurance, etc. and Defendant 1. Wallenius Wihelmsen Logistics SA (hereinafter referred to as "Respondent Wallnius") as a company doing business in shipping, logistics, brokering, and others is, as explained below, a contractual carrier for the cargo in the present case, loaded in Ulsan and discharged in Newark, US.   Defendant 2. Eukor Car Carriers Co., Ltd. (hereinafter referred to as "Respondent Eukor Car") as a shipping company operating pure car carrier, pure car/truck carrier, and roll-on/roll-off vessels specialized in carriage of vehicles and other types of vessels, as explained below, is the actual carrier for the cargo in the present case.

### 2.   Export of the cargo in the present case, etc.

#### A.   Execution of the Sale and Purchase Contract, etc.

Doosan Infracore Co., Ltd. (hereinafter referred to as "Doosan Infracore") contracted with Doosan Infracore America Corporation (hereinafter referred to as "Doosan America") to export, in total, 44 cases with the gross weight 386,660kg of CNC Lateh & Machining Centre (hereinafter referred to as "Cargo") to a USA port

at the price of USD3,668,224,87 inclusive of cost, insurance, and freight (so called, CIF condition) (Refer to Plaintiff Exhibit No. 1-1, 2 Respective Commercial Invoices and Plaintiff Exhibit No. 2-1,2 Respective Packing Lists).

**B.  Execution of the Ocean Carrier Contract, etc.**

On 30 April 2010, Doosan Infracore made with the Defendants the Ocean Carrier Contract (hereinafter referred to as the "Ocean Carrier Contract"), under which Defendant Wallenius shall be the Carrier and Defendant Eukor Car shall be the Actual Carrier in respect of carriage of construction equipment and machinery manufactured and exported by Doosan Infracore for a period from 1 April 2010 to 31 March 2013 (Article 1) with freights to be determined depending on the importing country, subject to increase by 3% in each year for the three years, which includes the carriage of Cargo (Refer to Plaintiff Exhibit No. 3 Ocean Carrier Contract).

The details of the Ocean Carrier Contract are as follows:

*Article 4 Tonnage*

*Actual Carrier will carry all equipment under deck in Pure Car Carriers (PCCs), Pure Car & Truck Carriers (PCTCs), or Ro-Ro vessels.*

*Article 8 Responsibility of Carrier*

*A)  Actual Carrier shall be responsible for the equipments and machine tools from ramp end to ramp end basis.  Actual Carrier shall be responsible for the safe transportation of the equipments and machine tools and Actual Carrier shall, as soon as possible, notify shipper regarding the occurrence of the equipments and machine tools while providing its transportation services according to Carrier's Bill of Lading.*

B) *The responsibility of Actual Carrier provided under this Article "Responsibility of Carrier" shall also apply in cases where Actual Carrier transports the equipments and machine tools using vessels operated by any third party in accordance with this Contract or in cases where Actual Carrier entrusts all or any part of the transportation services relating to this Contract to any third party.*

C) *The responsibilities of Actual Carrier under this Article 8 and any other provisions of this Contract shall be guaranteed by Carrier.*

*Article 11 Bill of Lading*

*Carrier's Bill of Lading forms (Appendix C) to be used for shipments under this Contract.   Carrier shall issue and directly deliver to Shipper the original Bill of Lading.*

*Article 12 Arbitration and Governing Law*

*This contract shall be construed and governed by the laws of the Republic of Korea. (omitted) All disputes not settled by amicable agreement may be referred to binding arbitration by either party (omitted).*

## C.  Carriage of the Cargo

According to the Ocean Carrier Contract, Doosan Infracore requested Defendant Wallenius for the carriage of the Cargo from Ulsan, Korea to Newark, US and Defendant Wallenius in turn requested Defendant Eukor Car; ultimately, Defendant Eukor Car loaded 22 cases in the gross weight 236,280kg of the Cargo on MV Grand Quest (hereinafter referred to as the "Vessel") at the port of Ulsan on 27 July 2011 and thereby issued a Sea Waybill (No. KR1131944W; refer to Plaintiff Exhibit No. 4-1 Sea Waybill) to Defendant Wallenius and Defendant Wallenius issued a House B/L (No. KR1131944; refer to Plaintiff Exhibit No. 4-2 House B/L)

to Doosan Infracore.

Also, on the same day, Defendant Eukor Car safely loaded the remaining 22 cases in the gross weight of 150,380kg of the Cargo on board the Vessel at the port of Ulsan and issued a Sea Waybill (No. KR1131949W; refer to Plaintiff Exhibit No. 5-1 Sea Waybill) to Defendant Wallenius and Defendant Wallenius issued a House B/L (No. KR1131949; refer to Plaintiff Exhibit No. 5-2 House B/L) to Doosan Infracore.

D. **Execution of the cargo insurance agreement**

On 26 July 2011, Doosan Infracore made with Plaintiff the marine insurance agreements (Certificate of Marine Cargo Insurance No. 727110690117 and No. 727110690118; refer to Plaintiff Exhibit No. 6-1, 2 respectively Certificates of Marine Cargo Insurance) for all risks coverage in respect of the insurance amount of USD1,556,518.33 (=USD1,415,016.76 x 110%) and the insurance amount of USD2,478,528.92 (=USD2,253,208.11 x 110%) respectively.

3. **Damage to the Cargo**

A. **Occurrence of the Incident**

The Vessel departed Ulsan and on 22 and 23 August 2011, the Vessel discharged at Brunswick, US 2,455 cars out of the 3,798 cars which had been loaded on board the Vessel together with the Cargo. Thereafter, the Vessel in order to avoid Hurricane Irene took refuge at Baltimore instead of the originally intended Bayonne, New Jersey in the US and discharged the remaining 1,344 cars at Baltimore on 27 August 2011. Thereafter, the Vessel, only laden with the Cargo on deck no. 7, departed Baltimore and at or around 0415 hours on 28 August 2011, the Vessel encountered Hurricane Irene at about 200 miles off to the east of Baltimore and 21 cases out of the Cargo were damaged completely (hereinafter referred to as the "Incident"; refer to Plaintiff Exhibit No. 7 Report of Survey p. 6).

**B.  Damages sustained due to the Incident**

Damages arising as a result of the Incident was calculated to be USD2,340,384,08 based on the Commercial Invoice amounts for the total loss of the 21 cases of the Cargo (refer to Plaintiff Exhibit No. 8 Payment on Account p. 4).

**4.   Defendants' liabilities to compensate**

**A.  Liability to compensate under the Ocean Carrier Contract**

Pursuant to the Ocean Carrier Contract (Refer to Plaintiff Exhibit No. 3 Ocean Carrier Contract p. 1), Defendant Wallenius as contracted Carrier and Defendant Eukor Car as Actual Carrier are obliged to properly carry by sea and deliver cargoes Doosan Infracore exports, including the Cargo.  But, the Incident occurred as some of the Cargo dislocated from their own secured places and collided with each other, causing total loss; the factors contributed to the Incident are that though Defendants had been aware of the risk of encountering Hurricane Irene during the voyage, the Vessel neither took refuge at a safe port nor discharged the Cargo at a safe port but continued sailing, and that though the Vessel could have avoided the Incident by reinforcing the lashing and/or securing, the Vessel failed to do so.  Therefore, Defendants are in breach of the Ocean Carrier Contract, directly liable for the damages under the Ocean Carrier Contract and alternatively, in tort, Defendants are jointly responsible to pay compensation for the damages.

**B.  Liability to compensate under the B/L**

Defendant Wallenius issued the House B/Ls and thereby have the obligation to safely deliver the Cargo, which was received in a good condition, to the receiver. Notwithstanding that, Defendant Wallenius, as stated above, was negligent and caused the Incident.   Hence, Defendant Wallenius is liable to the receiver of the

Cargo, Doosan America, under the House B/Ls and alternatively, Defendant Wallenius jointly and severally with Defendant Eukor Car is liable for the damages arising from their tortious act.

On the other hand, Defendant Eukor Car issued the master B/Ls and thereby have the obligation to safely deliver the Cargo, which was received in a good condition, to the receiver.   Notwithstanding that, Defendant Eukor Car, as stated above, was negligent and caused the Incident, infringing upon the Cargo owner's right to the title.   Hence, Defendant Eukor Car jointly and severally with Defendant Wallenius is liable for the damages arising from their tortious act.

5.   **Doosan Infracore's assignment of the right to claim for compensation under the Ocean Carrier Contract**

On 22 August 2012, Doosan Infracore assigned to Plaintiff the respective rights to claim for compensation under the Ocean Carrier Contract and on 22 August 2012, the assignments were notified upon Defendants (Refer to Plaintiff Exhibit No. 9-1, 2 respectively Notices of Assignment).   Plaintiff as assignee of the rights from Doosan Infracore has the right to pursue the claims in the present matter.

6.   **Payment of the insurance monies in respect of the Cargo in the present case and subrogation by the insurer**

On 30 December 2011, Plaintiff paid Doosan America, i.e., the insured, the insurance money in the amount of USD2,574,422.49 (=USD2,340,384.08 x 110%) in respect of the total loss of 21 cases out of the Cargo (refer to Plaintiff Exhibit No. 10 Remittance Slip) and thereby obtained the right of claim Doosan America has against Defendants.

7.   **Conclusion**

Defendants are jointly and severally liable to indemnify for the sum USD2,340,384.08 in respect of the Incident and applying the applicable trading standard rate

(USD1:KRW1,082.00 available on 26 August 2011; the Incident occurred on 28 August 2011, which was a holiday so the banking day most prior to the date of the Incident was 26 August 2011 and the trading standard rate of 26 August 2011 shall be applicable; refer to Plaintiff Exhibit 11 Foreign Exchange Rate) the sum is converted to KRW2,532,295,574 (=USD2,340,384.08 x 1,082.00, rounded off to a digit).

Therefore, Defendants are jointly and severally obliged to pay Plaintiff KRW2,532,295,574 plus delay interest accruing at 6% per annum from 31 December 2011 until the date of receipt of this Complaint and as per the Act on Special Cases concerning Expedition etc. of Legal Proceedings, at 20% per annum therefrom until the date of full payment .   Plaintiff filed this Complaint seeking the payment above.

### Method of Proof

| | |
|---|---|
| Plaintiff Exhibit No. 1-1, 1-2 | Commercial Invoice |
| Plaintiff Exhibit No. 2-1, 2-2 | Packing List |
| Plaintiff Exhibit No. 3 | Ocean Carrier Contract |
| Plaintiff Exhibit No. 4-1 | Sea Waybill |
| Plaintiff Exhibit No. 4-2 | House B/L |
| Plaintiff Exhibit No. 5-1 | Sea Waybill |
| Plaintiff Exhibit No. 5-2 | House B/L |
| Plaintiff Exhibit No. 6-1, 6-2 | Certificates of Marine Cargo Insurance |
| Plaintiff Exhibit No. 7 | Report of Survey |
| Plaintiff Exhibit No. 8 | Payment on Account |
| Plaintiff Exhibit No. 9-1, 9-2 | Notices of Assignment |
| Plaintiff Exhibit No. 10 | Remittance Slip |
| Plaintiff Exhibit No. 11 | Foreign Exchange Rate (as of 26 August 2011) |

### Attached Documents

| | |
|---|---|
| 1. Copies of the Complaint | 1 copy each |

| 1. Method of Proof above | 1 copy each |
| 1. Power of Attorney | 1 copy |
| 1. Copy of the Corporate Register | 1 copy each |
| 1. Statement of Payment | 1 copy |

30 August 2012

Plaintiff Legal Representative
Sung Keuk Cho, Attorney at law
Seug Hee Yoon, Attorney at law
Yong June Kim, Attorney at law
Dong Hyun Kim, Attorney at law

To the Seoul Central District Court

Exhibit 2

Trans/U101-1121_Abitration120910.swc

[Translation]

## Application for Arbitration

Applicant      Dongbu Insurance Co., Ltd.
               432 Teheran-no, Gangnam-gu, Seoul
               Jeong Nam Kim, Representative Director

               Legal representatives for Applicant
               Sung Keuk Cho, Attorney at law
               Seug Hee Yoon, Attorney at law
               Yong June Kim, Attorney at law
               Dong Hyun Kim, Attorney at law
               5 Fl. Rock Bldg. 58-4 Banpo-4dong, Seocho-gu, Seoul (137-803)
               Tel: 02)592-5790, Fax: 02)592-5793

Respondents    **1. Wallenius Wihelmsen Logistics SA**
               Strandveien 12, N-1366 Laysaker, Norway
               Arild Iversen, Representative Director
               Korean Branch
               10 Fl. Seoul Newpapers Bldg. 25 Tapyeongno-1ga, Jung-gu, Seoul (157-280)
               Seong Eun Kang, Representative in Korea

               **2. Eukor Car Carriers Co., Ltd.**
               13 Fl. Capital Tower 736-1 Yeoksam-dong, Gangnam-gu, Seoul (135-808)
               Representative Direcotr Sure Galtung

**Application for arbitration in respect of claim for indemnity**

**Tenor of the Application**

We pray for that:

1.  Respondents shall jointly and severally pay Applicant KRW2,532,295,574 plus interest accruing at 6% per annum from 31 December 2011 until the date of receipt of this Application and at 20% per annum therefrom until the date of full payment.

2.  Costs for arbitration shall be borne by Respondents.

### Grounds for the Application

**1.    Status of the Parties**

Applicant is a company doing business in providing marine insurance, etc. and Respondent 1. Wallenius Wihelmsen Logistics SA (hereinafter referred to as "Respondent Wallneius") as a company doing business in shipping, logistics, brokering, and others is, as explained below, a contractual carrier for the cargo in the present case, loaded in Ulsan and discharged in Newark, US.   Respondent 2. Eukor Car Carriers Co., Ltd. (hereinafter referred to as "Respondent Eukor Car") as a shipping company operating pure car carrier, pure car/truck carrier, and roll-on/roll-off vessels specialized in carriage of vehicles and other types of vessels, as explained below, is the actual carrier for the cargo in the present case.

**2.    Export of the cargo in the present case, etc.**

**A.  Execution of the Sale and Purchase Contract, etc.**

Doosan Infracore Co., Ltd. (hereinafter referred to as "Doosan Infracore") contracted with Doosan Infracore America Corporation (hereinafter referred to as "Doosan America") to export, in total, 44 cases with the gross weight 386,660kg of CNC Lateh & Machining Centre (hereinafter referred to as "Cargo") to a USA port at the price of USD3,668,224,87 inclusive of cost, insurance, and freight (so called, CIF condition) (Refer to Applicant Exhibit No. 1-1, 2 Respective Commercial

Invoices and Applicant Exhibit No. 2-1,2 Respective Packing Lists).

**B.    Execution of the Ocean Carrier Contract, etc.**

On 30 April 2010, Doosan Infracore made with the Respondents the Ocean Carrier Contract (hereinafter referred to as the "Ocean Carrier Contract"), under which Respondent Wallenius shall be the Carrier and Respondent Eukor Car shall be the Actual Carrier in respect of carriage of construction equipment and machinery manufactured and exported by Doosan Infracore for a period from 1 April 2010 to 31 March 2013 (Article 1) with freights to be determined depending on the importing country, subject to increase by 3% in each year for the three years, which includes the carriage of Cargo.

The details of the Ocean Carrier Contract are as follows:

*Article 4 Tonnage*

*Actual Carrier will carry all equipment under deck in Pure Car Carriers (PCCs), Pure Car & Truck Carriers (PCTCs), or Ro-Ro vessels.*

*Article 8 Responsibility of Carrier*

*A) Actual Carrier shall be responsible for the equipments and machine tools from ramp end to ramp end basis.  Actual Carrier shall be responsible for the safe transportation of the equipments and machine tools and Actual Carrier shall, as soon as possible, notify shipper regarding the occurrence of the equipments and machine tools while providing its transportation services according to Carrier's Bill of Lading.*

*B) The responsibility of Actual Carrier provided under this Article "Responsibility of Carrier" shall also apply in cases where Actual Carrier transports the equipments and machine tools using vessels operated by any*

*third party in accordance with this Contract or in cases where Actual Carrier entrusts all or any part of the transportation services relating to this Contract to any third party.*

*C) The responsibilities of Actual Carrier under this Article 8 and any other provisions of this Contract shall be guaranteed by Carrier.*

*Article 11 Bill of Lading*

*Carrier's Bill of Lading forms (Appendix C) to be used for shipments under this Contract.   Carrier shall issue and directly deliver to Shipper the original Bill of Lading.*

*Article 12 Arbitration and Governing Law*

*This contract shall be construed and governed by the laws of the Republic of Korea. (omitted) All disputes not settled by amicable agreement may be referred to binding arbitration by either party (omitted).*

## C.  Carriage of the Cargo

According to the Ocean Carrier Contract, Doosan Infracore requested Respondent Wallenius for the carriage of the Cargo from Ulsan, Korea to Newark, US and Respondent Wallenius in turn requested Respondent Eukor Car; ultimately, Respondent Eukor Car loaded 22 cases in the gross weight 236,280kg of the Cargo on MV Grand Quest (hereinafter referred to as the "Vessel") at the port of Ulsan on 27 July 2011 and thereby issued a Sea Waybill (No. KR1131944W; refer to Applicant Exhibit No. 4-1 Sea Waybill) to Respondent Wallenius and Respondent Wallenius issued a House B/L (No. KR1131944; refer to Applicant Exhibit No. 4-2 House B/L) to Doosan Infracore.

Also, on the same day, Respondent Eukor Car safely loaded the remaining 22 cases

in the gross weight of 150,380kg of the Cargo on board the Vessel at the port of Ulsan and issued a Sea Waybill (No. KR1131949W; refer to Applicant Exhibit No. 5-1 Sea Waybill) to Respondent Wallenius and Respodent Wallenius issued a House B/L (No. KR1131949; refer to Applicant Exhibit No. 5-2 House B/L) to Doosan Infracore.

## D.  Execution of the cargo insurance agreement

On 26 July 2011, Doosan Infracore made with Applicant the marine insurance agreements (Certificate of Marine Cargo Insurance No. 727110690117 and No. 727110690118; refer to Applicant Exhibit No. 6-1,2 Respective Certificates of Marine Cargo Insurance) for all risks coverage in respect of the insurance amount of USD1,556,518.33 (=USD1,415,016.76 x 110%) and the insurance amount of USD2,478,528.92 (=USD2,253,208.11 x 110%) respectively.

## 3.  Damage to the Cargo

## A.  Occurrence of the Incident

The Vessel departed Ulsan and on 22 and 23 August 2013, the Vessel discharged at Brunswick, US 2,455 cars out of the 3,798 cars which had been loaded on board the Vessel together with the Cargo.  Thereafter, the Vessel in order to avoid Hurricane Irene took refuge at Baltimore instead of the originally intended Bayonne, New Jersey in the US and discharged the remaining 1,344 cars at Baltimore on 27 August 2011.  Thereafter, the Vessel, only laden with the Cargo on deck no. 7, departed Baltimore and at or around 0415 hours on 28 August 2011, the Vessel encountered Hurricane Irene at about 200 miles off to the east of Baltimore and 21 cases out of the Cargo were damaged completely (hereinafter referred to as the "Incident"; refer to Applicant Exhibit No. 7 Report of Survey p. 6).

## B.  Damages sustained due to the Incident

Damages arising as a result of the Incident was calculated to be USD2,340,384,08 based on the Commercial Invoice amounts for the total loss of the 21 cases of the Cargo (refer to Applicant Exhibit No. 8 Payment on Account p. 4).

**4.   Respondents' liabilities to compensate**

**A.   Liability to compensate under the Ocean Carrier Contract**

Pursuant to the Ocean Carrier Contract (Refer to Applicant Exhibit No. 3 Ocean Carrier Contract p. 1), Respondent Wallenius as contracted Carrier and Respondent Eukor Car as Actual Carrier are obliged to properly carry by sea and deliver cargoes Doosan Infracore exports, including the Cargo.   But, the Incident occurred as some of the Cargo dislocated from their own secured places and collided with each other, causing total loss; the factors contributed to the Incident are that though Respondents had been aware of the risk of encountering Hurricane Irene during the voyage, the Vessel neither took refuge at a safe port nor discharged the Cargo at a safe port but continued sailing, and that though the Vessel could have avoided the Incident by reinforcing the lashing and/or securing, the Vessel failed to do so.   Therefore, Respondents are in breach of the Ocean Carrier Contract, directly liable for the damages under the Ocean Carrier Contract and alternatively, in tort, Respondents are jointly responsible to pay compensation for the damages.

**B.   Liability to compensate under the B/L**

Respondent Wallenius issued the House B/Ls and thereby have the obligation to safely deliver the Cargo, which was received in a good condition, to the receiver. Notwithstanding that, Respondent Wallenius, as stated above, was negligent and caused the Incident.   Hence, Respondent Wallenius is liable to the receiver of the Cargo, Doosan America, under the House B/Ls and alternatively, Respondent Wallenius jointly and severally with Respondent Eukor Car is liable for the

damages arising from their tortious act.

On the other hand, Respondent Eukor Car issued the master B/Ls and thereby have the obligation to safely deliver the Cargo, which was received in a good condition, to the receiver.   Notwithstanding that, Respondent Eukor Car, as stated above, was negligent and caused the Incident, infringing upon the Cargo owner's right to the title.   Hence, Respondent Eukor Car jointly and severally with Respondent Wallenius is liable for the damages arising from their tortious act.

5.   **Doosan Infracore's assignment of the right to claim for compensation under the Ocean Carrier Contract**

On 22 August 2012, Doosan Infracore assigned to Applicant the respective rights to claim for compensation under the Ocean Carrier Contract and on 22 August 2012, the assignments were notified upon Respondents (Refer to Applicant Exhibit No. 9-1, 2 Respective Notices of Assignment).   Applicant as assignee of the rights from Doosan Infracore has the right to pursue the claims in the present matter.

6.   **Payment of the insurance monies in respect of the cargo in the present case and subrogation by the insurer**

On 30 December 2011, Applicant paid Doosan America, i.e., the insured, the insurance money in the amount of USD2,574,422.49 (=USD2,30,384.08 x 110%) in respect of the total loss of 21 cases out of the Cargo (refer to Applicant Exhibit No. 10 Remittance Slip) and thereby obtained the right of claim Doosan America has against Respondents.

7.   **Arbitration agreement**

In accordance with the Ocean Carrier Contract (Applicant Exhibit No. 3 Ocean Carrier Contract Article 11), any dispute that was not resolved by amicable settlement may be refer to arbitration and such arbitration shall follow the Korean Commercial Arbitration Board's rules.

**8.   Conclusion**

Respondents are jointly and severally liable to indemnify for the sum USD2,340,384.08 in respect of the Incident and applying the applicable trading standard rate (USD1:KRW1,082.00 available on 26 August 2011; the Incident occurred on 28 August 2011, which was a holiday so the banking day most prior to the date of the Incident was 26 August 2011 and the trading standard rate of 26 August 2011 shall be applicable; refer to Applicant Exhibit 11 Foreign Exchange Rate) the sum is converted to KRW2,532,295,574 (=USD2,340,384.08 x 1,082.00, rounded off to a digit).

Therefore, Respondents are jointly and severally obliged to pay Applicant KRW2,532,295,574 plus delay interest accruing at 6% per annum from 31 December 2011 until the date of receipt of this Application and as per the Act on Special Cases concerning Expedition etc. of Legal Proceedings, at 20% per annum therefrom until the date of full payment .   Applicant made this Application seeking the payment above.

**Method of Proof**

Applicant Exhibit No. 1-1,2        Commercial Invoice
Applicant Exhibit No. 2-1,2        Packing List
Applicant Exhibit No. 3           Ocean Carrier Contract
Applicant Exhibit No. 4-1         Sea Waybill
Applicant Exhibit No. 4-2         House B/L
Applicant Exhibit No. 5-1         Sea Waybill
Applicant Exhibit No. 5-2         House B/L
Applicant Exhibit No. 6-1,2        Respective Certificates of Marine Cargo Insurance
Applicant Exhibit No. 7           Report of Survey
Applicant Exhibit No. 8           Payment on Account
Applicant Exhibit No. 9-1,2        Respective Notices of Assignment
Applicant Exhibit No. 10          Remittance Slip

Applicant Exhibit No. 11          Foreign Exchange Rate (as of 26 August 2011)

### Attached Documents

| | |
|---|---|
| 1. Copies of the Application | 4 copies |
| 1. Method of Proof above | 1 copy each |
| 1. Power of Attorney | 1 copy |
| 1. Copy of the Corporate Register | 1 copy each |
| 1. Statement of Payment | 1 copy |

30 August 2012

Applicant's Legal Representative
Sung Keuk Cho, Attorney at law
Seug Hee Yoon, Attorney at law
Yong June Kim, Attorney at law
Dong Hyun Kim, Attorney at law

To the Korea Commercial Arbitration Board

Exhibit 3

두산   글로넷

# OCEAN CARRIER CONTRACT

This agreement , made as of April 30th,2010 among Doosan Infracore Co., Ltd.  ( hereinafter "Shipper") having its principal place of business at 7-11, Hwasu-dong, Dong-gu, Inchon, the Republic of Korea and Wallenius Wilhelmsen Logistics AS (hereinafter referred to as the "Carrier" ) having its principal place of business at Stranveien 20 , P.O.Box33 , N-1324 Lysaker , Norway) and EUKOR CAR CARRIERS Inc. ( hereinafter referred to as the "Actual Carrier") having its principal place of business at 736-1 Yeoksam-Dong, Kangnam-Gu, Seoul, 135-983, Korea.

NOW, THEREFORE, the parties hereto agree as follows:

### 1.  CONTRACT PERIOD

This agreement shall be in effect for a period of 3 (three) years from 1st April 2010 to 31st March 2013 and shall hereafter be automatically renewed annually for another 1(one) year upon the expiry date thereof unless any party provides a 60(sixty) days written notice of termination to other parties before the expiry date.

### 2.  CARGO

Construction equipment (excavator/wheel loader/forklift and parts) and Machine Tools manufactured by Shipper for Export

### 3.  VOLUME

Volume  herein shall be those set forth in Appendix "A"

### 4.  TONNAGE

Actual Carrier will carry all equipments under deck in Pure Car Carriers (PCCs), Pure Car & Truck Carriers (PCTCs), or Ro-Ro vessels.

### 5.  PORTS

Loading and Discharging ports herein shall be those set forth in Appendix "A"

### 6.  OCEAN FREIGHT RATES

1

The rates applicable to all cargo destined to various destinations carried under this Contract shall be the "Base O/F Rate" set forth in Appendix A pertained to this Contract. In addition, all other charges except said "Base O/F Rate", surcharges, bunker surcharges, arbitraries / additionals and rules in Carrier's governing tariff(s) applicable at the time of shipment. Especially BAF (bunker adjustment factor) will be applicable as per BAF Clause set forth in Appendix B.

## 7. PAYMENT TERM

100 percent full freight to be paid in cash in U.S. Dollars to Carrier's nominated bank account on every 20th of the following month of B/L Issue Date

## 8. RESPONSIBILITY OF CARRIER

A) Actual Carrier shall be responsible for the equipments and machine tools from ramp end to ramp end basis. Actual Carrier shall be responsible for the safe transportation of the equipments and machine tools and Actual Carrier shall, as soon as possible, notify shipper regarding the occurrence of any special circumstances, including occurrence of any damage, loss or destruction of the equipments and machine tools while providing its transportation services according to Carrier's Bill of Lading.

B) The responsibility of Actual Carrier provided under this Article " Responsibility of Carrier" shall also apply in cases where  Actual Carrier transports the equipments and machine tools using vessels operated by any third party in accordance with this Contract or  in cases where Actual Carrier entrusts all or any part of the transportation services relating to this Contract to any third party.

C) The responsibilities of Actual Carrier under this Article 8 and any other provisions of this Contract shall be guaranteed by Carrier.

## 9. STEVEDORAGE TERM

Full liner terms, both ends including loading, lashing, securing both in the vessel and in the loading port and  discharging port and unlashing of cargo. Loading , lashing  and securing material   will be placed by Actual Carrier at his own expense.

## 10.  NOTICE OF BOOKING & VESSEL SCHEDULE

Shipper shall provide Carrier with the following four types of forecasts: a) an annual forecast; b) a 3 months forecast (which will be updated on a monthly basis); c) a monthly forecast; and a weekly forecast. Each of the aforementioned forecasts shall provide the total number of equipments to be transported during the relevant forecast

2

term with respect to each type of equipments. Carrier shall provide and continuously
update Shipper with a plan for the scheduling of vessel.

With regard to setting up plans for loading the equipments and scheduling vessel as stated
in the above, Shipper and Carrier shall refer to the manufacturing schedules of
equipments and machine tools, loading and unloading sequences, transportation schedule, and the
stowage plan of the vessels.

Actual Carrier shall place vessels in accordance with the mutually agreed loading schedule as
provided to Actual Carrier

## 11. BILL OF LADING

Carriers' Bill of Lading forms (Appendix C) to be used for shipments under this
Contract. Carrier shall issue and directly deliver to Shipper the original Bill of Lading.

## 12. ARBITRATION AND GOVERNING LAW

This contract shall be construed and governed by the laws of the Republic of Korea.
All disputes arising out of or in connection with this Agreement or its performance, including
validity, scope, meaning, construction, interpretation or application hereof, shall to the extent
possible be settled amicably by negotiation and discussion by the parties.
All disputes not settled by amicable agreement may be referred to binding arbitration by either
party. The arbitration shall be held in Seoul, Korea and conducted in accordance with the
applicable rules of arbitration of Korean Commercial Arbitration Board. The award rendered by
the arbitrator(s) shall be final and binding upon the parties and shall be enforceable in any court
of competent jurisdiction.

## 13. FORCE MAJEURE

Neither party hereto shall be responsible for delay or failure to perform any of its
obligations under Contract due to any of one of the following reasons, which cannot be
attributed to either party. This is interpreted as conditions arising out of Acts of God,
war, strike, prohibition of export & import, lockouts, or any other force majeure events
substantially equivalent to the foregoing.

In the event that any one of the force majeure events occurs or is expected to occur, the
party affected by such event shall immediately give written notice to the other party of
the effect of the same on its ability to perform its obligations and use its best efforts to

3

eliminate or alleviate the effects of such cause.

## 14. CONFIDENTIALITY

Each party shall treat as strictly confidential all information related to Contract and shall not divulge, in whole or in part, to any third party without the written consent of the other party

## 15. APPENDIX

A) Service Details
B) BAF Clause
C) Carrier's Original Bill of Lading

## 16. PARAMOUNT CLAUSE

Any matter not specified in this contract shall be governed by the Clauses of Carrier's Bill of Lading (B/L).

This contract is made out in three originals whereof the parties have taken one each

**DOOSAN INFRACORE Co. Ltd.,**
 **as Shipper**

By : _____

Name : Hyea Gyu, Choi

Title : G. manger

4

**WALLENIUS WILHELMSEN LOGISTICS AS**
as Carrier

By :

Name : C.K. Kim

Title : G. MANAGER

**EUKOR CAR CARRIERS INC.**
as Actual Carrier

By :

Name : S. W. Oh

Title : General Manager

5

Exhibit 4

**BILL OF LADING**
FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 1/3

| | |
|---|---|
| SHIPPER<br>DOOSAN INFRACORE CO., LTD.<br>DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA,<br>JUNG-GU,<br>SEOUL,<br>KOREA 100-730 | BOOKING NO.<br>KRSEL935374 / BILL OF LADING NO.<br>KR1131944 |
| | EXPORT REFERENCES (A) |
| CONSIGNED TO ORDER OF<br>DOOSAN INFRACORE AMERICA CORPORATION<br>19 CHAPIN ROAD BUILDING A<br>PINE BROOK, NJ 07058,<br>U.S.A | FORWARDING AGENT - FMC NO. (B) |
| | POINT AND COUNTRY OF ORIGIN (C)<br>REPUBLIC OF KOREA |
| NOTIFY PARTY/ADDRESS<br>DOOSAN INFRACORE AMERICA CORPORATION<br>19 CHAPIN ROAD BUILDING A<br>PINE BROOK, NJ 07058,<br>U.S.A | ALSO NOTIFY - ROUTING INSTRUCTION (D) |

| PRE-CARRIAGE BY | PLACE OF RECEIPT* | | |
|---|---|---|---|
| VESSEL/VOYAGE<br>GRAND QUEST  FQ164 | PORT OF LOADING<br>ULSAN,SOUTH KOREA | ACCEPTANCE TERMINAL/LOADING PIER (E) | |
| PORT OF DISCHARGE<br>NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIAGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS.<br>CONTAINER NO. | NO. OF UNITS<br>OR PKGS | DESCRIPTION OF GOODS (H) | | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|---|
| PUMA 700XLY/F32IA<br>DOOSAN(IN DIA)<br>DEST:NEWARK<br>MADE IN KOREA<br>C/NO:8<br>M/C<br>NO:ML0170-000042<br>PUMA 700L/F32IA<br>-DITTO-<br>C/NO:9,10<br>M/C<br>NO:ML0158-001117<br>ML0158-001118<br>PUMA 300C/F0ITD<br>-DITTO-<br>C/NO:21<br>M/C<br>NO:ML0052-003623<br>PUMA 300LMC/F0ITD<br>-DITTO- | 22 | CASE(S)<br>CNC LATHE & MACHINING CENTER<br><br>PUMA 700XLY    1 SET<br>PUMA 700L       1 SET<br>PUMA 300C       1 SET<br>PUMA 300CMC     1 SET<br>PUMA 400CMC     1 SET<br>PUMA 700L       1 SET<br>PUMA V400L      1 SET<br>PUMA VT900L     1 SET<br>PUMA VT1100     1 SET<br>HM 6300        1 SET<br>DBC 130        1 SET<br>------------------------------------<br>TOTAL       11 SET<br>------------------------------------<br>* SAY:22 CASE(S) ONLY. | | 236280.000<br>KGS | 793.281<br>CBM |

TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10)     Twenty-two Unit(s)

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Declared Value (See clause 10) | EXTRA CHARGE: | | NONE | | | | |
|---|---|---|---|---|---|---|---|
| PLACE AND DATE OF ISSUE (YEAR MONTH DATE)<br>SEOUL, KOREA     2011  07  27 | | | | EXCHANGE RATE | TOTAL | | |
| for the Carrier Wallenius Wilhelmsen Logistics AS | | | | TOTAL PREPAID IN LOCAL CURRENCY | | PREPAID AT<br>SEOUL, KOREA | WOODCLIFF LAKE, |
| | | | | In witness of the contract herein contained accomplished the others to be void | | THREE Original Bill of Lading have been issued,one of which being | |

B/L AS - 01/06                    as Carrier

# BILL OF LADING

FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 2/3

| SHIPPER<br>DOOSAN INFRACORE CO., LTD.<br>DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA,<br>JUNG-GU,<br>SEOUL,<br>KOREA 100-730 | BOOKING NO.<br>KRSEL935374 | BILL OF LADING NO.<br>KR1131944 |
|---|---|---|

EXPORT REFERENCES (A)

| CONSIGNED TO ORDER OF<br>DOOSAN INFRACORE AMERICA CORPORATION<br>19 CHAPIN ROAD BUILDING A<br>PINE BROOK, NJ 07058,<br>U.S.A |
|---|

FORWARDING AGENT - FMC NO. (B)

POINT AND COUNTRY OF ORIGIN (C)
REPUBLIC OF KOREA

| NOTIFY PARTY/ADDRESS<br>DOOSAN INFRACORE AMERICA CORPORATION<br>19 CHAPIN ROAD BUILDING A<br>PINE BROOK, NJ 07058,<br>U.S.A |
|---|

ALSO NOTIFY - ROUTING INSTRUCTION (D)

| PRE-CARRIAGE BY | PLACE OF RECEIPT* | |
|---|---|---|
| VESSEL/VOYAGE<br>GRAND QUEST  FQ164 | PORT OF LOADING<br>ULSAN,SOUTH KOREA | ACCEPTANCE TERMINAL/LOADING PIER (E) |
| PORT OF DISCHARGE<br>NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIAGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS<br>CONTAINER NO. | NO. OF UNITS<br>OR PKGS | DESCRIPTION OF GOODS (H) | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|
| C/NO:12<br>M/C<br>NO:ML0067-003579<br>PUMA 400LMC/F0ITD<br>-DITTO-<br>C/NO:15<br>M/C<br>NO:ML0137-004456<br>PUMA V400L/F0ITD<br>-DITTO-<br>C/NO:27<br>M/C<br>NO:MT0006-000864<br>PUMA VT900L/F0ITD<br>-DITTO-<br>C/NO:14<br>M/C<br>NO:MT0028-001199<br>PUMA VT1100/F32IA<br>-DITTO- | | | | |

| TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10) | Twenty-two Unit(s) |
|---|---|

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Declared Value (See clause 10) | EXTRA CHARGE: | NONE | |
|---|---|---|---|

| PLACE AND DATE OF ISSUE (YEAR MONTH DATE)<br>SEOUL, KOREA    2011  07  27 | EXCHANGE RATE | TOTAL |
|---|---|---|

for the Carrier Wallenius Wilhelmsen Logistics AS

| TOTAL PREPAID IN LOCAL CURRENCY | PREPAID AT<br>SEOUL, KOREA | WOODCLIFF LAKE, |
|---|---|---|

In witness of the contract herein contained
accomplished the others to be void

THREE ginal Bill of Lading have been issued,one of which being

B/L AS - 01/06                                                as Carrier

**BILL OF LADING**
FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 3/3

| SHIPPER | BOOKING NO. KRSEL935374 | BILL OF LADING NO. KR1131944 |
|---|---|---|
| DOOSAN INFRACORE CO., LTD. DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA, JUNG-GU, SEOUL, KOREA 100-730 | EXPORT REFERENCES (A) | |

| CONSIGNED TO ORDER OF | FORWARDING AGENT - FMC NO. (B) |
|---|---|
| DOOSAN INFRACORE AMERICA CORPORATION 19 CHAPIN ROAD BUILDING A PINE BROOK, NJ 07058, U.S.A | |
| | POINT AND COUNTRY OF ORIGIN (C) REPUBLIC OF KOREA |

| NOTIFY PARTY/ADDRESS | ALSO NOTIFY - ROUTING INSTRUCTION (D) |
|---|---|
| DOOSAN INFRACORE AMERICA CORPORATION 19 CHAPIN ROAD BUILDING A PINE BROOK, NJ 07058, U.S.A | |

| PRE-CARRIAGE BY | PLACE OF RECEIPT* |
|---|---|
| VESSEL/VOYAGE GRAND QUEST FQ164 | PORT OF LOADING ULSAN,SOUTH KOREA |

ACCEPTANCE TERMINAL/LOADING PIER (E)

| PORT OF DISCHARGE NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIAGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS CONTAINER NO. | NO. OF UNITS OR PKGS | DESCRIPTION OF GOODS (H) | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|
| C/NO:13 M/C NO:MT0034-001167 HM 6300/F31IA -DITTO- C/NO:2-1,2-2,2-3,2 -4 M/C NO:MH0011-001172 DBC 130/F31IA -DITTO- C/NO:24-1 ~ 24-9 M/C NO:MB0003-000331 ON BOARD 27/07/2011. | 13 | FREIGHT PREPAID. | | |

TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10)   Twenty-two Unit(s)

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| Declared Value (See clause 10) | EXTRA CHARGE: | NONE | | | | | |

| PLACE AND DATE OF ISSUE (YEAR MONTH DATE) SEOUL, KOREA    2011  07  27 | EXCHANGE RATE | TOTAL |
|---|---|---|

for the Carrier Wallenius Wilhelmsen Logistics AS

TOTAL PREPAID IN LOCAL CURRENCY | PREPAID AT SEOUL, KOREA | PREPAID AT WOODCLIFF LAKE,

In witness of the contract herein contained accomplished the others to be void   THREE original Bill of Lading have been issued,one of which being

B/L AS - 01/06          as Carrier

**BILL OF LADING**
FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 1/4

| SHIPPER | BOOKING NO. | BILL OF LADING NO. |
|---|---|---|
| DOOSAN INFRACORE CO., LTD. DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA, JUNG-GU, SEOUL, KOREA 100-730 | KRSEL935374 | KR1131949 |

EXPORT REFERENCES (A)

| CONSIGNED TO ORDER OF | FORWARDING AGENT - FMC NO. (B) |
|---|---|
| DOOSAN INFRACORE AMERICA CORPORATION 19 CHAPIN ROAD BUILDING A PINE BROOK, NJ 07058, U.S.A | |
| | POINT AND COUNTRY OF ORIGIN (C) REPUBLIC OF KOREA |

| NOTIFY PARTY/ADDRESS | ALSO NOTIFY - ROUTING INSTRUCTION (D) |
|---|---|
| DOOSAN INFRACORE AMERICA CORPORATION 19 CHAPIN ROAD BUILDING A PINE BROOK, NJ 07058, U.S.A | |

| PRE-CARRIAGE BY | PLACE OF RECEIPT* | | |
|---|---|---|---|
| VESSEL/VOYAGE GRAND QUEST FQ164 | PORT OF LOADING ULSAN,SOUTH KOREA | ACCEPTANCE TERMINAL/LOADING PIER (E) | |
| PORT OF DISCHARGE NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIAGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS CONTAINER NO. | NO. OF UNITS OR PKGS | DESCRIPTION OF GOODS (H) | | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|---|
| LYNX 220A/F0ITD DOOSAN(IN DIA) DEST:NEWARK MADE IN KOREA C/NO:20 M/C NO:ML0013-005345 LYNX 300M/F0ITD -DITTO- C/NO:17 M/C NO:ML0032-000181 VC 500/F32IA -DITTO- C/NO:16 M/C NO:MV0019-001057 MYNX 5400/40/F0IMD -DITTO- C/NO:18,19 | 22 | CASE(S) CNC LATHE & MACHINING CENTER LYNX 220A LYNX 300M PUMA 240C PUMA 240C VC500 MYNX 5400/40 MYNX 5400/40 HC 400 HC 400 HP 4000 HP 6300 HP 5100 LYNX 220A LYNX 220A LYNX 300 ------------------------------------ TOTAL | 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 1 SET 15 SET | 150380.000 KGS | 583.322 CBM |

TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10)    Twenty-two Unit(s)

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

| Declared Value (See clause 10) | EXTRA CHARGE: | | NONE | | | | |
|---|---|---|---|---|---|---|---|
| PLACE AND DATE OF ISSUE (YEAR MONTH DATE) SEOUL, KOREA    2011  07  27 | | | | EXCHANGE RATE | TOTAL | | |
| for the Carrier Wallenius Wilhelmsen Logistics AS | | | | TOTAL PREPAID IN LOCAL CURRENCY | | PREPAID AT SEOUL, KOREA | WOODCLIFF LAKE, |
| | | | | In witness of the contract herein contained accomplished the others to be void | | THREEginal Bill of Lading have been issued,one of which being | |

B/L AS - 01/06    as Carrier

**BILL OF LADING**
FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 2/4

| SHIPPER | BOOKING NO. | BILL OF LADING NO. |
|---|---|---|
| DOOSAN INFRACORE CO., LTD. DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA, JUNG-GU, SEOUL, KOREA 100-730 | KRSEL935374 | KR1131949 |

| | |
|---|---|
| | EXPORT REFERENCES (A) |

| CONSIGNED TO ORDER OF | FORWARDING AGENT - FMC NO. (B) |
|---|---|
| DOOSAN INFRACORE AMERICA CORPORATION 19 CHAPIN ROAD BUILDING A PINE BROOK, NJ 07058, U.S.A | |
| | POINT AND COUNTRY OF ORIGIN (C) REPUBLIC OF KOREA |

| NOTIFY PARTY/ADDRESS | ALSO NOTIFY - ROUTING INSTRUCTION (D) |
|---|---|
| DOOSAN INFRACORE AMERICA CORPORATION 19 CHAPIN ROAD BUILDING A PINE BROOK, NJ 07058, U.S.A | |

| PRE-CARRIAGE BY | PLACE OF RECEIPT* | | |
|---|---|---|---|
| VESSEL/VOYAGE GRAND QUEST  FQ164 | PORT OF LOADING ULSAN,SOUTH KOREA | ACCEPTANCE TERMINAL/LOADING PIER (E) | |
| PORT OF DISCHARGE NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS CONTAINER NO. | NO. OF UNITS OR PKGS | DESCRIPTION OF GOODS (H) | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|
| M/C NO:MV0046-000431 MV0046-000432 HC 400/F32IA -DITTO- C/NO:4-1,4-2,5-1,5 -2 M/C NO:MH0001-000603 MH0001-000602 HP 5100/F32IA -DITTO- C/NO:6-1,6-2,6-3 M/C NO:MH0005-000307 HP 4000/F31IA -DITTO- C/NO:3-1,3-2 M/C NO:MH0004-000285 | | ------------------------------------ * SAY:22 CASE(S) ONLY. | | |

TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10)    Twenty-two Unit(s)

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Declared Value (See clause 10) | EXTRA CHARGE: | NONE | | | | | |
|---|---|---|---|---|---|---|---|

| PLACE AND DATE OF ISSUE (YEAR MONTH DATE) SEOUL, KOREA    2011  07  27 | EXCHANGE RATE | | TOTAL | | |
|---|---|---|---|---|---|
| for the Carrier Wallenius Wilhelmsen Logistics AS | TOTAL PREPAID IN LOCAL CURRENCY | | PREPAID AT SEOUL, KOREA | WOODCLIFF LAKE, |
| | TOTAL PREPAID IN LOCAL CURRENCY SEOUL, KOREA | In witness of the contract herein contained accomplished the others to be void | THREE Original Bill of Lading have been issued,one of which being | |

B/L AS - 01/06                                        as Carrier

**BILL OF LADING**
FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 3/4

| SHIPPER | BOOKING NO. KRSEL935374 | BILL OF LADING NO. KR1131949 |
|---|---|---|

SHIPPER
DOOSAN INFRACORE CO., LTD.
DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA,
JUNG-GU,
SEOUL,
KOREA 100-730

EXPORT REFERENCES (A)

CONSIGNED TO ORDER OF
DOOSAN INFRACORE AMERICA CORPORATION
19 CHAPIN ROAD BUILDING A
PINE BROOK, NJ 07058,
U.S.A

FORWARDING AGENT - FMC NO. (B)

POINT AND COUNTRY OF ORIGIN (C)
REPUBLIC OF KOREA

NOTIFY PARTY/ADDRESS
DOOSAN INFRACORE AMERICA CORPORATION
19 CHAPIN ROAD BUILDING A
PINE BROOK, NJ 07058,
U.S.A

ALSO NOTIFY - ROUTING INSTRUCTION (D)

| PRE-CARRIAGE BY | PLACE OF RECEIPT* | |
| VESSEL/VOYAGE GRAND QUEST FQ164 | PORT OF LOADING ULSAN, SOUTH KOREA | ACCEPTANCE TERMINAL/LOADING PIER (E) |
| PORT OF DISCHARGE NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS CONTAINER NO. | NO. OF UNITS OR PKGS | DESCRIPTION OF GOODS (H) | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|
| HP 6300/F31IA -DITTO- C/NO:7-1,7-2,7-3 M/C NO:MH0007-000190 LYNX 220A/F0ITD -DITTO- C/NO:26,23 M/C NO:ML0013-005346 ML0013-005349 LYNX 300/F0ITD -DITTO- C/NO:25 M/C NO:ML0031-000159 PUMA 240C/F0ITD -DITTO- C/NO:4,6 ML0039-005976 | | | | |

TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10)    Twenty-two Unit(s)

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| Declared Value (See clause 10) | EXTRA CHARGE: | | NONE | | | |
| PLACE AND DATE OF ISSUE (YEAR MONTH DATE) SEOUL, KOREA  2011  07  27 | | EXCHANGE RATE | TOTAL | |
| for the Carrier Wallenius Wilhelmsen Logistics AS | TOTAL PREPAID IN LOCAL CURRENCY | PREPAID AT SEOUL, KOREA | WOODCLIFF LAKE, |
| | In witness of the contract herein contained accomplished the others to be void | THREE Original Bill of Lading have been issued,one of which being |

B/L AS - 01/06          as Carrier

**BILL OF LADING**
FOR COMBINED TRANSPORT
OR PORT TO PORT SHIPMENT

WALLENIUS WILHELMSEN
LOGISTICS

Page 4/4

| | |
|---|---|
| **SHIPPER**<br>DOOSAN INFRACORE CO., LTD.<br>DOOSAN TOWER 22ND FL. 18-12, EULJIRO-6GA,<br>JUNG-GU,<br>SEOUL,<br>KOREA 100-730 | **BOOKING NO.**<br>KRSEL935374    **BILL OF LADING NO.**<br>KR1131949 |
| | **EXPORT REFERENCES (A)** |
| **CONSIGNED TO ORDER OF**<br>DOOSAN INFRACORE AMERICA CORPORATION<br>19 CHAPIN ROAD BUILDING A<br>PINE BROOK, NJ 07058,<br>U.S.A | **FORWARDING AGENT - FMC NO. (B)** |
| | **POINT AND COUNTRY OF ORIGIN (C)**<br>REPUBLIC OF KOREA |
| **NOTIFY PARTY/ADDRESS**<br>DOOSAN INFRACORE AMERICA CORPORATION<br>19 CHAPIN ROAD BUILDING A<br>PINE BROOK, NJ 07058,<br>U.S.A | **ALSO NOTIFY - ROUTING INSTRUCTION (D)** |

| PRE-CARRIAGE BY | PLACE OF RECEIPT* | | |
|---|---|---|---|
| VESSEL/VOYAGE<br>GRAND QUEST   FQ164 | PORT OF LOADING<br>ULSAN,SOUTH KOREA | ACCEPTANCE TERMINAL/LOADING PIER (E) | |
| PORT OF DISCHARGE<br>NEWARK, NJ,USA | PLACE OF DELIVERY* | TYPE OF MOVE (F) | ON-CARRIAGE BY (G) |

Carrier's receipt - Carrier has not checked contents or weight

PARTICULARS IN BOXES A THRU J AS DECLARED BY THE MERCHANT BUT NOT ACKNOWLEDGED BY THE CARRIER

| MARKS AND NOS<br>CONTAINER NO. | NO. OF UNITS<br>OR PKGS | DESCRIPTION OF GOODS (H) | GROSS WEIGHT (I) | MEASUREMENT (J) |
|---|---|---|---|---|
| ML0039-005974<br>ON BOARD 27/07/2011. | | FREIGHT PREPAID. | | |

TOTAL NO. OF UNITS OR PACKAGES RECEIVED BY THE CARRIER IN WORDS (SEE CLAUSE 10)     Twenty-two Unit(s)

* APPLICABLE ONLY WHEN DOCUMENT USED AS COMBINED TRANSPORT BILL OF LADING. (SEE CLAUSE 1).

| FREIGHT & CHARGES | CODE | REVENUE TONS | RATE | CURR. | Per | PREPAID | COLLECT |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| Declared Value (See clause 10) | EXTRA CHARGE: | NONE | | | | | |

| PLACE AND DATE OF ISSUE (YEAR MONTH DATE)<br>SEOUL, KOREA    2011  07  27 | EXCHANGE RATE | TOTAL | | |
|---|---|---|---|---|
| for the Carrier Wallenius Wilhelmsen Logistics AS | TOTAL PREPAID IN LOCAL CURRENCY | PREPAID AT<br>SEOUL, KOREA | WOODCLIFF LAKE, |
| | In witness of the contract herein contained<br>accomplished the others to be void | THREE Original Bill of Lading have been issued,one of which being | |
| B/L AS - 01/06      as Carrier | | | |

Case 1:12-cv-08067-GBD Document 1 Filed 11/05/12 Page 55 of 66

**WALLENIUS WILHELMSEN LOGISTICS AS**
www.2wglobal.com

Received in the external apparent good order and condition, except as otherwise described in the Carrier's Receipt. The description by the Merchant in boxes "I" through "J" have not been checked, weighed or measured by the Carrier. The information in Boxes "A" through "J" are consequently by this agreement not considered part of the Carrier's Bill of Lading. They are for the use of the Merchant and its freight forwarder only.

**1. DEFINITIONS**

(a) "Carrier" means Wallenius Wilhelmsen Logistics AS, vessels used in the carriage, their owners, and operators. The Carrier will be referred to as "Carrier" or as "WWL".

(b) "Carriage" means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods covered by this bill of lading.

(c) "Combined Transport" means a Carriage for which the Carrier agrees to be responsible from the place of receipt indicated on the face of this bill of lading to the place of delivery indicated on the face of this bill of lading.

(d) "Container" includes any container, trailer, transportable tank, flat or pallet, packaging or any similar article used to consolidate cargo and any ancillary equipment.

(e) "Goods" mean the cargo described in the bill of lading. If the Containers, equipment or other packaging are not furnished by the Carrier, those Containers, equipment and other packaging are also "Goods."

(f) "Merchant" means the shipper, consignee, holder, party receiver of the Goods, holder of this bill of lading, and any person, including any corporation, company, or other legal entity, owning the Goods or entitled to the possession of the Goods or acting on behalf of the Goods or any such entity. Their obligations are joint and several.

(g) "Package" means the largest means used to prepare cargo for transportation, including but not limited to, a skid, pallet, Container, trailer or device.

(h) "Port to Port Shipment" means a shipment from one port to another port. The Carrier would be responsible for the Goods only from the Port of Loading indicated on the face of this bill of lading to the Port of Discharge indicated on the face of this bill of lading.

(i) "Subcontractor" includes but is not limited to owners, operators and charterers (time, voyage and slot) of vessels, (other than the Carrier), stevedores, terminal and groupage operators, road and rail transport operators and any independent contractor employed directly or indirectly by the Carrier in performance of the Carriage.

(j) "Third Party On-Carriage" means the transfer of the Goods and the responsibility for the Goods from WWL to another carrier. The duty, responsibility, and liability of WWL ceases at on-carriage. See Clause 4.

(k) "WWL" means Wallenius Wilhelmsen Logistics AS.

(l) The following definitions (l), (m), and (n) may apply if the Merchant has requested to use the Bolero System:

(l) "Bolero Bill of Lading" means this bill of lading if and while it is controlled by the Bolero System.

(m) "Bolero User" means a person enrolled in the Bolero System. (A Bolero Bill of Lading will only be issued if all parties to the bill of lading are Bolero Users.)

(n) "Surrender Party" – If the Merchant requests a Bolero Bill of Lading, and a Bolero Bill of Lading is issued, Surrender Party is a Bolero "User" who is designated as the person to whom the Bolero Bill of Lading must be presented to obtain delivery of the Goods at the end of the Carriage.
If the Merchant wishes to use the Bolero system, or another electronic system, the Merchant agrees that the Bolero System, or the other electronic system, will act as agent for the Merchant rather than the Carrier. In performance for the Carrier's agreement to allow the Merchant to use the Bolero system, or another electronic system, Merchant agrees to indemnify and hold the Carrier harmless from any damage suffered by the Merchant in connection with the Bolero system or other electronic system. If this bill of lading is a Bolero Bill of Lading, the Merchant acknowledges that the Bolero Rulebook Governing Procedures, and other documents may affect the issuance, transfer, pledge, or surrender of this bill of lading. The Merchant agrees to abide by those rules and procedures and to give the Carrier notice or instructions in a timely fashion. If another electronic system is used, the system's rules, regulations, and procedures may affect the issuance, transfer, pledge, or surrender of the bill of lading. The Merchant agrees to abide by those rules, regulations, and procedures and to give the Carrier any required notice or instructions in a timely fashion.
In the case of any conflict between this bill of lading and the Bolero Rulebook or other document, or another electronic system's rules or procedures, this bill of lading will prevail.

**2. ACCEPTANCE OF BILL OF LADING AND CARRIER'S TARIFFS, RULES, AND RATES**

In accepting this bill of lading, the Merchant agrees to be bound by all its terms, conditions and limitations, whether printed, stamped, or written on the front or back of the bill of lading, as well as the provisions of the Carrier's published freight Tariffs, Rates, and Rules, as fully as if they were all specifically accepted in writing by the Merchant, even if local customs or practice are to the contrary. A copy of the relevant tariffs may be obtained from any agent of the Carrier. In the event of a conflict between the terms of a tariff and the terms of this bill of lading, the terms of this bill of lading will govern.

**3. SCOPE OF THIS BILL OF LADING**

This bill of lading evidences the contract of carriage from the time the Carrier accepts complete custody and control of the Goods at the place of receipt or the port of loading described on the face of this bill of lading until the Carrier delivers custody or control of the Goods at the port of discharge or the place of delivery described on the face of this bill of lading. The terms and conditions of the bill of lading apply during the Carriage described by this bill of lading on all modes of transportation and storage. They apply before the Goods are loaded onboard any means of transportation, and after the Goods are discharged from any means of transportation as well as while the Goods are onboard any means of transportation.

**4. THIRD PARTY ON-CARRIAGE**

The Merchant and the Carrier may indicate, in a clause on the face of this bill of lading, that the Goods will be on-carried beyond the Port of discharge or Place of delivery. WWL is not responsible for such on-carriage and is not liable for loss or damage of or to the Goods during on-carriage. WWL will act only as agent of the Merchant to arrange such on-carriage. WWL's duties and responsibilities will be completed at the place of on-carriage as if WWL had delivered the cargo according to Clause 6.

**5. RECEIPT FOR CONDITION AND QUANTITY OF GOODS**

The Carrier acknowledges receipt only of the external, apparent condition of the Goods' packaging, including containers, and the quantity of the Goods or their packages, including Containers, that are visible and apparent to the Carrier and that the Carrier has reasonable means to check. If the Carrier receives a sealed Container, the Carrier is only responsible to deliver the Container intact with the seal intact. The Carrier shall not be liable for loss, damage, or injury caused by improper stuffing of Containers that has been performed by the Merchant or on the Merchant's behalf. This exception shall include, but shall not be limited to, a defective condition of the Container that should have been obvious to the Merchant, its agent, or servant at the time the Container was loaded. The Merchant shall be liable for, and shall hold the Carrier harmless from, any and all loss, damage or injury caused by the Goods, which by their nature are dangerous, fragile, perishable, or are improperly stuffed or secured in the Container or are insufficiently packaged.
Goods are not to be shipped inside vehicles or other cargo unless the Carrier agrees in writing to accept such additional goods and extra freight is paid. The Carrier is not responsible for such additional goods unless the Carrier agrees in writing to carry the goods.

**6. DELIVERY**

The Carrier will deliver the Goods by one of the following means:
(a) Place the Goods at a place, reasonably safe and fit relative to the conditions at the place of delivery and allow the person entitled to delivery up to 5 days to assume custody and control of the Goods unless the nature of the Goods or custom, law or regulation at the place of delivery suggest a shorter time; or
(b) Relinquish exclusive custody and control of the Goods to a person entitled to the possession and control of the Goods; or
(c) Relinquish custody and control of the Goods to a port authority or other authority or entity to whom custody and control is customarily relinquished at the place of delivery or port of discharge.
(d) Any means provided by the applicable tariff.
The Carrier is not responsible for Goods not picked up within the time allowed by the relevant tariff. If no time is specified in the tariff, by the custom of the trade, or if no time is specified in the tariff or custom of the trade, within 5 days. The Carrier may remove such Goods from the Container or other packaging furnished by the Carrier, and/or place the Goods in a storage facility or other available place at the risk and expense of the Goods and the Merchant. That liability will act as an agent of the Merchant, not the Carrier. Demurrage will continue to be charged for the Container and other carrier equipment until the Container and other equipment are returned to the Carrier. The demurrage will constitute a lien against the Goods. Goods not picked up within 30 days may be sold to exercise liens for freight, demurrage, storage, handling, and other charges.
The contract of carriage is complete and the Carrier has no further responsibility for the Goods after delivery. If the Goods are on-carried, the Carrier will have no responsibility for Goods during on-carriage. See Clause 4.

**7. MERCHANT'S RESPONSIBILITY**

The Merchant warrants that it has authority to enter into this bill of lading and that it has properly and accurately described the Goods on the face of the bill of lading. It also warrants that proper labels and markings are on the Goods or their packaging, that the Goods are properly prepared and packaged for transportation, and that all necessary instructions for transportation have been given to the Carrier.
The Merchant also warrants that the Goods are safe for transportation on all modes of transportation. Although the Merchant agrees to comply with all relevant treaties, conventions, laws, and regulations, it agrees that such compliance alone may not be sufficient to satisfy this warranty. It action beyond such compliance is required to assure that the Goods are safe for transportation, that action will be taken by the Shipper. The Carrier has the right to destroy or render harmless any Goods that the Carrier reasonably believes present a danger of damage.
The Merchant warrants that the vessel will not incur any line, penalty or other expense because of the Goods, their preparation for transportation, packing, labeling or any other aspect of the Goods.
The Merchant agrees to hold the Carrier harmless and to indemnify it from any expenses or liability incurred, and to defend the Carrier if any aspect of these warranties is violated.
If the Merchant issues its own bill of lading or other shipping document, it warrants that the terms of its bill of lading or document will be not less favorable to the Carrier than this bill of lading. The Merchant agrees to hold harmless and indemnify and defend the Carrier if its bill of lading or document is less favorable than this bill of lading.
If Containers supplied by or on behalf of the Carrier are unpacked at the Merchant's premises, the Merchant is responsible for returning the empty Containers, with interiors clean, to the point or place designated by the Carrier, his servants or agents, within the time prescribed. Should a Container not be returned within the time prescribed in the Tariff, the Merchant shall be liable for any detention, loss or expense which may arise from such non-return.
Containers released from the care of the Merchant for packing, unpacking or any other purpose whatsoever are at the sole risk of the Merchant whilst in his control. The Merchant shall indemnify the Carrier for all loss and or damage to such Containers. Merchants are deemed to be aware of the dimensions of any Containers released to him.
The Merchant agrees to indemnify and hold harmless the Carrier in respect of any expenses and liability whatsoever and howsoever arising (including and without limiting the foregoing from negligence or breach of contract or wilful act or default of the Carrier or others) in respect of any breach of these warranties

**8. CARRIER NOT OBLIGED TO DELIVER IF BILL IS MORE THAN SIX MONTHS OLD**

The Carrier is under no obligation to deliver the Goods if the bill of lading is surrendered to the Carrier more than six months after its date.

**9. APPLICABLE LIABILITY REGIME**

Unless the carriage is described in paragraph 9 (a), (b) or (c), the contract of carriage evidenced by this bill of lading is governed by the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Brussels, August 25, 1924 (as amended by the Visby Amendments in 1968 and the Brussels SDR Protocol in 1979 (Hague/Visby Rules)) they are incorporated into this bill of lading as if they were fully set forth herein. These rules shall apply before and after the Goods are loaded onboard and after they have been discharged from any vessel or other mode of transportation as well as while the Goods are on board any vessel or other mode of transportation.
(a) If this bill of lading evidences a contract of carriage from Australia or New Zealand, it is governed by the Australian Carriage of Goods by Sea Act, 1991 as amended (Australian COGSA) or the Chapter XVI of the New Zealand Maritime Transport Act, 1994 (New Zealand Act), whichever is relevant. In respect of the carriage of goods by sea. Subject to the compulsory application of Australia and New Zealand law, the Carriage is subject to the Hague-Visby Rules.
(b) If, and only if, a dispute that arises from this bill of lading is litigated in a forum that must apply the United Nations Convention on the Carriage of Goods by Sea Act 1978 (the Hamburg Rules), the following provision will apply.
This bill of lading shall take effect subject to any national law in force at the place of receipt or place of issuance of the bill of lading making the United Nations Convention on the Carriage of Goods by Sea Act 1978 (the Hamburg Rules) compulsorily applicable to this bill of lading, in which case this bill of lading shall have effect subject to the Hamburg Rules. The Hamburg Rules shall nullify any stipulation derogating therefrom to the detriment of the shipper or consignee.
If any term of this bill of lading be repugnant to the above Rules and/or legislation to any extent, such terms shall be void to that extent, but no further.
(d) Application of CMR and CMI – In the event a dispute that arises from this bill of lading is litigated in a forum that must apply the Carriage of Goods by Road Act of 1965 (CMR) or the International Convention Concerning Carriage of Goods by Rail (CMI 1980) to part of the carriage, that Act will govern only the portion of the carriage that it governs by the force of law.
Notwithstanding any provision of this bill of lading other than the compulsory application of the Hamburg Rules, the provisions of any act, statute or other law or rule will be incorporated by reference into this bill of lading if its incorporation would increase the Carrier's liability above the provisions of either: a) the United States Carriage of Goods by Sea Act, as it was enacted in 1936 without any amendment; or b) the Hague-Visby Rules, whichever applies to the carriage evidenced by this bill of lading.

**10. LIMITATION OF CARRIER'S LIABILITY**

If the Hague-Visby Rules or the Australian COGSA or the New Zealand Maritime Transport Act, 1994 apply to the contract evidenced by this bill of lading, the Carrier's liability is limited to 666.67 Special Drawing Rights of the International Monetary Fund (SDRs) per package or 2 SDR's per kilogram, whichever is higher.
If U.S. COGSA applies to the contract evidenced by this bill of lading, the Carrier's liability is limited to U.S. $500 per package, or for Goods not shipped in packages, per customary freight unit, unless a higher value is declared in the Declared Value box on the face of this bill of lading and a higher freight is paid. Each unpackaged vehicle or other piece of unpackaged cargo on which freight is calculated, constitutes one customary freight unit.

**11. NOTICE OF DAMAGE**

The absence of written notice of loss or damage from the Merchant at the time of delivery of Goods with patent loss or damage or within three (3) days of delivery of Goods with latent loss or damage, shall constitute prima facie evidence that the Carrier delivered the Goods in the same condition and quantity in which the Goods were described to the Carrier at the time of receipt or part of loading. Notice of loss or damage shall be addressed to the Carrier or his representative at the Place of Delivery, or the Port of Discharge if no Place of Delivery is named on the face of this bill of lading, or if the Goods have been on-carried by a third party.

**12. TIME LIMIT TO COMMENCE SUIT AGAINST CARRIER**

In any event, the Carrier will be relieved of all liability unless suit is commenced against the Carrier within one year from the date the Goods were delivered or the date they should have been delivered by the Carrier.
The Merchant warrants that it will preserve the time limit within which any action may be commenced by the Merchant or the Carrier against any party who may be responsible for loss of or damage to the Goods. The Merchant agrees to hold harmless, indemnify, and otherwise protect the Carrier against such loss or damage the Carrier may suffer due to the Merchant's failure to preserve such time limit.

**13. CHOICE OF FORUM**

All disputes arising from shipments to or from the United States will be decided only by the United States District Court for the Southern District of New York, in New York City. This court has exclusive jurisdiction over such disputes. The general law of the United States, in addition to the law specified in Clause 9 of this bill of lading, will apply to these disputes. All other disputes will be decided by the High Court, London, U.K. which will have exclusive jurisdiction over these disputes. The general law of England will apply to these disputes in addition to the law specified in Clause 9 of this bill of lading. No proceedings may be brought before any other forum or tribunal.

**14. ROUTES; LIBERTIES**

The Goods may be carried on service, different modes of transportation, by water, rail, and road. Within each mode, the Goods may also be carried on several vessels, trains, trucks, or other means of transportation. The carrier has the option to determine the route and the means of transport without notice to the Merchant. The route chosen by the Carrier may not be the most direct or shortest route and may be changed by the Carrier or its subcontractors. The Carrier may, if circumstances justify, destroy the Goods, abandon them or

discharge the Goods at any place and declare the Goods delivered at the risk of the Merchant.

**15. SUB-CONTRACTORS AND HIMALAYA CLAUSE**

The Carrier may sub-contract, directly or indirectly, the whole or any part of the contract of carriage on any terms. The parties to this bill of lading intend to extend its terms and conditions, including all defenses and limitations, to all parties who participate in its performance. The defenses, limitations, and the law governing this bill of lading with the force of law or incorporated by reference into this bill of lading shall extend to all parties that agree directly or indirectly with the carrier to perform all or any part of the contract of carriage. These parties shall include, but shall not be limited to, the following entities: underlying carriers, participating land carriers, stevedores, terminal operators, warehousemen, agents, voyage charterers, time charterers, slot or space charterers, direct and indirect sub-contractors, independent contractors, and every servant or agent of the Carrier or of a subcontractor.
For the purpose of this Clause, the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of such persons to who the terms and conditions of this bill of lading are extended and each of them and all such persons and each of them shall to this extent be or be deemed to be parties to this bill of lading.

**16. AGREEMENT TO CLAIM AGAINST NO ONE OTHER THAN THE CARRIER**

(a) The Merchant undertakes that no claim or allegation shall be made, whether by the Merchant or any other person who is or who may subsequently be interested in the Goods, against any person (other than the Carrier) (whether it is a Subcontractor, principal, employee, servant, agent or otherwise) which imposes or attempts to impose upon such person any liability whatsoever and howsoever arising (including without limiting the foregoing from negligence or breach of contract or wilful act or default of the Carrier or others) in connection with the Goods and if such claim or allegation should nevertheless be made to indemnify the Carrier and the person against whom such claim or allegation is made against all the consequences of such claim or allegation; and
(b) to indemnify the Carrier against any claim or allegation made against it by any person (other than the Merchant) in connection with any liability, in connection with the Goods.

**17. FREIGHT AND OTHER CHARGES**

Freight, whether it is pre-payable or collect, is fully earned when the Goods are delivered to the carrier, its agents or servants. The freight is fully earned in any event, without deduction, whether the Goods are lost or not lost. The freight may not be returned.
The Carrier has the right, but not the duty, to inspect Goods inside Containers or other packaging. If the Goods are not described correctly and as a result a lower freight is charged, the carrier will be entitled to the correct freight and all costs of calculating and collecting it, including but not limited to attorney fees and other legal fees, and interest on both the amount due and the cost of collection. If the Carrier considers the packing insufficient and re-cooperes the Goods, the Merchant will pay the Carrier's charge for re-cooperating and will pay the freight as computed for the re-cooperated Goods.

**18. LIEN**

The Carrier shall have a lien on the Goods and any document relating to the Goods or any other Goods, documents or property of the Merchant for any amount due the Carrier plus interest and the cost of collecting that amount with interest on these costs. The costs of collecting the amount due will include, but will not be limited to, attorney and other legal fees.

**19. GENERAL AVERAGE AND SALVAGE**

General Average is to be adjusted at any port or place at the Carrier's option and is to be settled according to the York-Antwerp Rules 1994, and any amendments. In the event the venture is placed in peril from any cause, even the negligence or other fault of the Carrier, for which, or for the consequences of which, the Carrier is not liable by reason of statute, law, treaty, convention, contract, or otherwise, the Merchant shall contribute with the Carrier in General Average according to the Statement prepared by the General Average Adjuster. The parties to this bill of lading agree to accept as binding the decisions of the General Average Adjuster as set forth in the Statement, and agree that the General Average Adjuster or the Carrier may exercise a lien against the Goods for General Average or Salvage.
The Merchant shall provide such security and payments on account as are requested by the General Average Adjuster within 50 days of such request. The Merchant agrees to provide such security and to make payments on account before or after the Goods have been delivered from the Carrier. The Merchant agrees that if the Goods have been delivered, or are otherwise not available for the purpose of assuring a lien against them, the Carrier may obtain such security, and payments on account by exercising a lien against any other property owned by the Merchant.
The Merchant shall also pay salvage and special charges incurred in respect of the Goods. If a salvaging vessel is owned or operated or chartered by the Carrier, salvage shall be paid as fully and in the same manner as if such salvaging vessel belonged to strangers. The Merchant hereby appoints the Carrier to act on behalf of the Merchant in any salvage proceeding in which the Merchant or the Carrier acquires an interest.

**20. BOTH TO BLAME COLLISION CLAUSE**

If a vessel on which the Goods are being carried collides with another vessel as the result of the negligence or fault of both vessels, the Merchant agrees to pay for loss of or damage to the Goods from the other vessel, and the other vessel obtains a contribution toward that damage payment from the Carrier, the Merchant will reimburse the Carrier for that contribution.

**21. DELAY AND CONSEQUENTIAL DAMAGE**

The Carrier is not responsible for consequential damages unless the carrier has agreed in writing to be responsible for the certain, specific damage that occurred. The Carrier does not agree to deliver the Goods at any particular time or for any particular market and thus is not responsible for any damage alleged to have been caused by delay. If, despite the foregoing provision, the Carrier is held liable for damages attributable to delay, those damages are limited to the total amount payable as freight for all of the Goods shipped under the bill of lading that induced the alleged delay.

**22. DECK STOWAGE**

The Carrier or vessel owner or operator, not the Merchant, has sole authority and responsibility to determine the stowage location of the Goods on vessels that carry the Goods. Goods stowed either by the Merchant or the Carrier, or its carriers, or are otherwise protected from the weather, will be carried on deck, and this bill of lading will not be deemed to indicate such deck stowage, and the Hague/Visby Rules, U.S. COGSA, or Australian COGSA or New Zealand Act, whichever applies to this bill of lading, shall apply to such deck cargo as if it were stowed below deck. Goods that are customarily carried on deck, may be carried on deck without notice to the Merchant and at the Goods' and the Merchant's risk. Goods not customarily carried on deck may be carried on deck at the risk of the Goods and the Merchant with the agreement of the Shipper if this bill of lading carries a note that the Goods are carried on deck at the risk of the Goods.

**23. SPECIAL VENTILATION, REFRIGERATION OR HEATING**

Special ventilation, refrigeration or heat will not be furnished to the Goods unless such special service is contracted for on the face of the bill of lading and extra freight is paid. The Merchant is responsible for inspecting each Container to determine whether it is fit to carry the Goods. The Merchant is also responsible to assure that the Goods and all the proper temperature before they are loaded into a refrigerated Container. The Merchant agrees to determine that the refrigeration equipment is set to the proper temperature, and that the Container is at the proper temperature before the Goods are loaded into the Container.
The Carrier is not responsible for heating, ventilating or refrigeration equipment when the equipment is not within its custody and control.

**24. STEEL, OTHER METAL CARGO, LUMBER AND WOOD**

Acknowledgement of receipt of steel, other metal cargo, lumber and wood in apparent, external, good order and condition in this bill of lading is not a representation by the Carrier that conditions of rust, oxidation or wetting and the like did not exist on receipt of such Goods by the Carrier. It is agreed that superficial rust, which normally occurs or any like condition is not a condition of damage to steel and other metal cargo. It is also agreed that wetting of lumber and wood is not a condition of damage. If a higher freight is paid the Carrier will, after a special proof of such loss of bills describing superficial rust, white rust, oxidation or wetness on such Goods.

**25. FIRE**

Neither the Carrier nor any party participating in the performance of the contract of carriage evidenced by this bill of lading is liable for any loss or damage caused by fire unless such fire or the failure properly to extinguish it was caused by the actual fault or privity of the Carrier.

**26. SEPARABILITY OF TERMS**

The terms of this bill of lading shall be separable and if any provision or this bill of lading or any part of any provision is held to be invalid or unenforceable, such holding shall not affect the validity or enforceability of any other provision or part of this bill of lading.

**WWL   B/L Clauses (Free MS word typing)**

**1.  DEFINITIONS**

(a)  "Carrier" means Wallenius Wilhlmsen Lines AS, vessels used in the carriage, their owners, and operators.

The Carrier will be referred to as "Carrier" or as "WWL."

(b)  "Carriage" means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods covered by this bill of lading.

(c)  "Combined Transport" means a Carriage for which the Carrier agrees to be responsible from the place of receipt indicated on the face of this bill of lading to the place of delivery indicated on the face of this bill of lading to the place of delivery indicated on the face of this bill of lading.

(d)  "Container" includes any container, trailer, transportable tank, flat or pallet, packaging or any similar article used to consolidate cargo and any ancillary equipment.

(e)  "Goods" mean the cargo described in the bill of lading.   If the Containers, equipment or other packaging are not furnished by Carrier, those Containers, equipment and other packaging are also " Goods."

(f)  "Merchant" means the shipper, consignee, notify party, receiver of the Goods, holder of this bill of lading and any person, including any corporation, company, or other legal entity, owning the Goods or entitled to the possession of the Goods or acting on behalf of the Goods or any such entity.   Their obligations are joint and several.

(g)  "Package" means the largest means used to prepare cargo for transportation, including but not limited to, a skid, pallet, Container, trailer or carton.

(h)  "Port to Port Shipment" means a shipment from one port to another port.   The Carrier would be responsible for the Goods only from the Port of Loading indicated on the face of this bill of lading to the Port of Discharge indicated on the face of this bill of lading.

(i)  "Subcontractor" includes but is not limited to owners, operators and charterers(time, voyage and slot) of vessels, (other than the Carrier), stevedores, terminal and groupage operators, road and rail transport operators and any independent contractor employed directly or indirectly by the Carrier in performance of the Carriage.

(j)  "Third Party On-Carriage" means the transfer of the Goods and the responsibility for the Goods from WWL to another carrier.   The duty, responsibility, and liability of WWL cease at on-carriage.   See Clause 4.

(k)  "WWL" means Wallenius Wilhelmsen Lines AS.

The following definitions (l), (m), and (n) may apply if the Merchant has requested to use the Bolero System:

(l)   "Bolero Bill of Lading" means this bill of lading if and while it is controlled by the Bolero System.

(m)  "Bolero User" means a person enrolled in the Bolero System.   (A Bolero Bill of Lading will only be issued if all parties to the bill of lading are Bolero Users.)

(n)   "Surrender Party" – If the Merchant requests a Bolero Bill of Lading, and a Bolero Bill of Lading is issued, Surrender Party is a Bolero "User" who is designated as the person to whom the Bolero Bill of Lading must be presented to obtain delivery of the Goods at the end of the Carriage.

If the Merchant wishes to use the Bolero system, or another electronic system, the Merchant agrees that the Bolero System, or the other electronic system, will act as agent for the Merchant rather than the Carrier.   In consideration for the Carrier's agreement to allow the Merchant to use the Bolero system, or another electronic system, the Merchant agrees to indemnify and hold the Carrier harmless from any damage suffered by the Carrier as a result of the Bolero system or other electronic system.   If this bill of lading is a Bolero Bill of Lading, the Merchant acknowledges that the Bolero Rulebook Operating Procedures, and other documents may affect the issuance, transfer, pledge, or surrender of this bill of lading.   The Merchant agrees to abide by those rules and procedures and to give the Carrier notice or instructions in a timely fashion.   If another electronic system is used, that system's rules, regulations, and procedures may affect the issuance, transfer, pledge, or surrender of the bill of lading.   The Merchant agrees to abide by those rules, regulations, and procedures and to give the Carrier any required notice or instructions in a timely fashion.

In the case of any conflict between this bill of lading and the Bolero Rulebook or other document, or another electronic system's rules or procedures, this bill of lading will prevail.

## 2. ACCEPTANCE OF BILL OF LADING AND CARRIER'S TARIFFS, RULES, AND RATES

In accepting this bill of lading the Merchant agrees to be bound by all its terms, conditions and limitations, whether printed, stamped, or written on the front or back of the bill of lading, as well as the provisions of the Carrier's published freight Tariffs, Rates, and Rules, as fully as if they were all specifically accepted in writing by the Merchant, even if local customs or practice are to the contrary.   A copy of the relevant tariffs may be obtained from any agent of the Carrier.   In the event of a conflict between the terms of a tariff and the terms of this bill of lading, the terms of this bill of lading will govern.

## 3. SCOPE OF THIS BILL OF LADING

This bill of lading evidences the contract of carriage from the time the Carrier accepts complete

custody and control of the Goods at the place of receipt or the port of loading described on the face of this bill of lading until the Carrier delivers custody or control of the Goods at the port of discharge or the place of delivery described on the face of this bill of lading.   The terms and conditions of the bill of lading apply during the Carriage described by this bill of lading on all modes of transportation and storage.   They apply before the Goods are loaded onboard any means of transportation, and after the Goods are discharged from any means of transportation as well as while the Goods are onboard any means of transportation.

## 4. THIRD PARTY ON-CARRIAGE

The Merchant and the Carrier may indicate, in a clause on the face of this bill of lading, that the Goods will be on-carried beyond the Port of discharge or Place of delivery.   WWL is not responsible for such on-carriage and is not liable for loss or damage of or to the Goods during on-carriage.   WWL will act only as agent of the Merchant to arrange such on-carriage.   WWL's duties and responsibilities will be completed at the place of on-carriage as if WWL had delivered the cargo according to Clause 6.

## 5. RECEIPT FOR CONDITION AND QUANTITY OF GOODS

The Carrier acknowledges receipt only of the external, apparent condition of the Goods' packaging, including, and the quantity of the Goods or their packages, including Containers, that are visible and apparent to the Carrier and that the Carrier has reasonable means to check.   If the Carrier receives a sealed Container, the Carrier is only responsible to deliver the Container intact with the seal intact.   The Carrier shall not be liable for loss, damage, or injury caused by improper stuffing of Containers that has been performed by the Merchant or on the Merchant's behalf.   This exception shall include, but shall not be limited to, a defective condition of the Container that should have been obvious to the Merchant, its agent, or servant at the time the Container was loaded.   The Merchant shall be liable for, and shall hold the Carrier harmless from, any and all loss, damage or injury caused by the Goods, which by their nature are dangerous, fragile, perishable, or are improperly stuffed or secured in the Container or are insufficiently packaged.

Goods are not to be shipped inside vehicles or other cargo unless the Carrier agrees in writing to accept such additional goods and extra freight is paid.   The Carrier is not responsible for such additional goods unless the Carrier agrees in writing to carry the goods.

## 6. DELIVERY

The Carrier will deliver the Goods by one of the following means:

(a) Place the Goods at a place, reasonably safe and fit relative to the conditions at the place of

delivery, and allow the person entitled to delivery up to 5 days to assume custody and control of the Goods unless the nature of the Goods or custom, law or regulation at the place of delivery suggest a shorter time: or

(b) Relinquish exclusive custody and control of the Goods to a person entitled to the possession and control of the Goods: or

(c) Relinquish custody and control of the Goods to a port authority or other authority or other entity to whom custody and control is customarily relinquished at the place of delivery or port of discharge.

(d) Any means provided by the applicable tariff.

The Carrier is not responsible for Goods not picked up within the time allowed by the relevant tariff, if no time is specified in the tariff, by the custom of the trade, or if no time is specified in the tariff or custom of the trade, within 5 days.  The Carrier may remove such Goods from the Container or other packaging furnished by the Carrier, and/or place the Goods in a storage facility or other available place at the risk and expense of the Goods and the Merchant.  That facility will act as an agent of the Merchant, not the Carrier. Demurrage will continue to be charged for the Container and other carrier equipment until the Container and other equipment are returned to the Carrier.  The demurrage will constitute a lien against the Goods.  Goods not picked up within 30 days may be sold to exercise liens for freight, demurrage, storage, handling, and other charges.

The contract of carriage is complete and the Carrier has no further responsibility for the Goods after delivery.  If the Goods are on-carried, the Carrier will have no responsibility for the Goods during on-carriage.  See Clause 4.

## 7. MERCHANT'S RESPONSIBILITY

The Merchant warrants that it has authority to enter into this bill of lading and that it has properly and accurately described the Goods on the face of this bill of lading.  It also warrants that proper labels and markings are on the Goods or their packaging, that the Goods are properly prepared and packaged for transportation, and that all necessary instructions for transportation have been given to the Carrier.

The Merchant also warrants that the Goods are safe for transportation on all modes of transportation.  Although the Merchant agrees to comply with all relevant treaties, conventions, laws, and regulation, it agrees that such compliance alone may not be sufficient to satisfy this warranty.  If action beyond such compliance is required to assure that the Goods are safe for transportation, that action will be taken by the Shipper.  The Carrier has the right to destroy or render harmless any Goods that the Carrier reasonably believes present a danger.

The Merchant warrants that the vessel will not incur any fine, penalty or other expense because

of the Goods, their preparation for transportation, packing, labeling or any other aspect of the Goods.

The Merchant agrees to hold the Carrier harmless and to indemnify it from any expenses or liability incurred, and to defend the Carrier if any aspect of these warranties is violated.

If the Merchant issues its own bill of lading or other shipping document, it warrants that the terms of its bill of lading or document will be no less favorable to the Carrier than this bill of lading.   The Merchant agrees to hold harmless and defend, and indemnify the Carrier if its bill of lading or document is less favorable than this bill of lading.

If Containers supplied by or on behalf of the Carrier are unpacked at the Merchant's premises, the Merchant is responsible for returning the empty Containers, with interiors clean, to the point or place designated by the Carrier, his servants or agents, within the time prescribed.   Should a Container not be returned within the time prescribed in the Tariff, the Merchant shall be liable for any detention, loss or expenses which may arise from such non-return.

Containers released into the care of the Merchant for packing, unpacking or any other purpose whatsoever are at the sole risk of the merchant whilst in his control.   The Merchant shall indemnify the Carrier for all loss and/ or damage to such Containers.

Merchants are deemed to be aware of the dimensions of any Containers released to him.

The Merchant agrees to indemnify and hold harmless the Carrier in respect of any expenses and liability whatsoever and howsoever arising (including and without limiting the foregoing from negligence or breach of contract or willful act or default of the Carrier or others) in respect of any breach of these warranties.

## 8.   CARRIER NOT OBLIGED TO DELIVER IF BILL OF LADING IS MORE THAN SIX MONTHS OLD

The Carrier is under no obligation to deliver the Goods if this bill of lading is surrendered to the Carrier more than six months after its date.

## 9.   APPLICABLE LIABILITY REGIME

Unless the carriage is described in paragraph 9 (a), (b) or (c), the contract of carriage evidenced by this bill of lading is governed by the international Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Brussels, August 25, 1924 (as amended by the Visby Amendments in 1968 and by the Brussels SDR Protocol in 1979 (Hague/Visby Rules)) they are incorporated into this bill of lading as if they sere fully set forth herein.   These rules shall apply before and after the Goods are to be loaded onboard and after they have been discharged from any vessel or other mode of transportation as well as while the Goods are on board   any vessel or other mode of transportation.

.

(a) If this bill of lading evidences a contract of carriage to or from the United States, it is governed by the United States Carriage of Goods by Sea Act, 49 U.S.C §§ 1300 et seq. (COGSA) and the Pomerene Act, 49 U.S.C. §§ 80101, et seq. (Pomerene Act).

They are incorporated by reference into the bill of lading as if they sere fully set forth herein. The Pomerene Act will apply both to bills of lading that evidence contracts for the carriage of cargo to the United States as well as from the United States.  Those acts shall apply before and after the Goods are loaded onboard or discharged from any vessel or other mode of transportation, as well while the goods are onboard any vessel, vehicle, train or other means of transportation.

(b) If this bill of lading evidences a contract of carriage from Australia or New Zealand, it is governed by the Australian Carriage of Goods by Sea Act, 1991 as amended (Australian COGSA) or the Chapter XVI of the New Zealand Maritime Transport Act, 1994 (New Zealand Act), whichever is relevant in respect of the carriage of goods by sea.  Subject to the compulsory application of Australia and New Zealand laws, the Carriage is subject to the Hague-Visby Rules.

(c) If, and only if, a dispute that arises from this bill of lading is litigated in a forum that must apply the United Nations Conventions on the Carriage of Goods by Sea Act 1978 (the Hamburg Rules), the following provision will apply.

This bill of lading shall take effect subject to any national law in force at the place of receipt or place of issuance of the bill of lading making the United Nations Convention on the Carriage of Goods by Sea Act 1978 (the Hamburg Rules) compulsorily applicable to this bill of lading, in which case this bill of lading shall have effect subject to the Hamburg Rules.  The Hamburg Rules shall nullify any stipulation derogating therefrom to the detriment of the shipper or consignee.

If any term of this bill of lading be repugnant to the above Rules and/or legislation to any extent, such terms shall be void to that extent, but no further.

(d) Application of CMR and CMI. In the event a dispute that arises from this bill of lading is litigated in a forum that must apply the Carriage of Goods by Road Act of 1965 (CMR) or the international Convention Concerning Carriage of Goods by Rail (CMI 1961) to part of the carriage, that Act will govern only the portion of the carriage that it governs by the force of law. Notwithstanding any provision of this bill of lading other than the compulsory application of the Hamburg Rules, no provision of any act, statute or other law or rule will be incorporated by reference into this bill of lading if its incorporation would increase the carrier's liability above the provisions of either: a) the United States Carriage of Goods by Sea Act, as it was enacted in 1936 without any amendment: or b) the Hague/Visby Rules, whichever applies to the contract evidenced by this bill of lading.

### 10. LIMITATION OF CARRIER'S LIABILITY

If the Hague/Visby Rules or the Australian COGSA or the New Zealand Maritime Transport Act, 1994 apply to the contract evidenced by this bill of lading, the Carrier's liability is limited to 666.67 Special Drawing Rights of the international Monetary Fund (SDR's) per package or 2 SDR's per kilogram, which ever is higher.

If U.S. COGSA applies to the contract evidenced by this bill of lading, the Carrier's liability is limited to U.S. $500 per package, or for Goods not shipped in packages, per customary freight unit, unless a higher value is declared in the Declared Value box on the face of the bill of lading and a higher freight is paid.   Each unpackaged vehicle or other piece of unpackaged cargo on which freight is calculated, constitutes one customary freight unit.

### 11. NOTICE OF DAMAGE

The absence of written notice of loss or damage from the Merchant at the time of delivery of Goods with patent loss or damage or within three (3) days of delivery of Goods with latent loss or damage, shall constitute prima facie evidence that the Carrier delivered the Goods in the same condition and quantity in which the Goods were delivered to the Carrier at the place of receipt or port of loading.   Notice of loss or damage shall be addressed to the Carrier or his representative at the Place of Delivery, or the Port of Discharge if no Place of Delivery is named on the face of this bill of lading, or if the Goods have been on-carried by a third party.

### 12. TIME LIMIT TO COMMENCE SUIT AGAINST CARRIER

In any event, the Carrier will be relieved of all liability unless suit is commenced against the Carrier within one year from the date the Goods were delivered or the date they should have been delivered by the Carrier.

The Merchant warrants that it will preserve the time limit within which any action may be commenced by the Merchant or the Carrier against any party who may be responsible for loss of or damage to the Goods.   The merchant agrees to hold harmless, indemnify, and otherwise protect the Carrier against such loss or damage the Carrier may suffer due to the Merchant's failure to preserve such time limit.

### 13. CHOICE OF FORUM

All disputes arising from shipments to or from the United States will be decided only by the United States District Court for the Southern District of New York, in New York, in New York City. This court has exclusive jurisdiction over such disputes.   The general law of the United States, in addition to the law specified in Clause 9 of this bill of lading, will apply to these disputes.   All other disputes will be decided by the High Court, London, U.K, which will have exclusive

jurisdiction over those disputes.   The general law of England will apply to those disputes in addition to the law specified in Clause 9 of this bill of lading.   No proceedings may be brought before any other forum or tribunal.

### 14. ROUTES, LIBERTIES

The Goods may be carried on several different modes of transportation, by water, rail, and road. Within each mode, the Goods may also be carried on several vessels, trains, trucks, or other means of transportation.   The carrier has the option to determine the route and the means of transport without notice to the Merchant.   The route chosen by the Carrier may not be the most direct or shortest route and may be interrupted.   The Carrier may, if circumstances justify, destroy the Goods, abandon them or discharge the Goods at any place and declare the Goods delivered and at the risk of the Merchant.

### 15. SUB-CONTRACTORS AND HIMALAYA CLAUSE

The Carrier may sub-contract, directly or indirectly, the whole or any part of the contract of carriage on any terms.   The parties to this bill of lading intend to extend its terms and conditions, including all defenses and limitations, to all parties who participate in its performance. The defenses, limitations, and the law governing this bill of lading with the force of laq or incorporated by reference into this bill of lading shall extend to all parties that agree directly or indirectly with the carrier to perform all or any part of the contract of carriage.   These parties shall include, but shall not be limited to, the following entities: underlying carriers, participating land carriers, stevedores, terminal operators, watching services, vessel operators, voyage charterers, time charterers, slot or space charterers, direct and indirect sub-contractors, independent contractors, and every servant or agent of the Carrier or of a subcontractor.

For the purpose of this Clause, the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of such persons to who the terms and conditions of this bill of lading are extended and each of them and all such persons and each of them shall to this extent be or be deemed to be parties to this bill of lading.

### 16. AGREEMENT TO CLAIM AGAINST NO ONE OTHER THAN THE CARRIER

(a) The Merchant undertakes that no claim or allegation shall be made, whether by the Merchant or any other person who is or who may subsequently be interested in the Goods, against any person (other than the Carrier) (whether it is a Subcontractor, principal, employer, servant, agent or otherwise) which imposes or attempts to impose upon such person any liability whatsoever and howsoever arising (including without limiting the foregoing from negligence or breach of contract or willful act or default of the Carrier or

others) in connection with the Goods and if such claim or allegation should nevertheless be made to indemnify the Carrier and the person against whom such claim or allegation is made against the consequences of such claim or allegation: and

(b) to indemnify the Carrier against any claim or allegation made against it by any person (other than the Merchant) in connection with any liability, in connection with the Goods.

## 17. FREIGHT AND OTHER CHARGES

Freight, whether it is pre-payable or collect, is fully earned when the Goods are delivered to the carrier, its agents or servants.   The freight is fully earned in any event, without deduction, whether the Goods are lost or not lost.   The freight may not be returned.

The Carrier has the right, but not the duty, to inspect Goods inside Containers or other packaging.   If the Goods are not described correctly and as a result a lower freight is charged, the carrier will be entitled to the correct freight and all the costs of calculating and collecting it, including but not limited to attorney fees and other legal fees, and interest on both the amount due and the cost of collection.   If the Carrier considers the packing insufficient and re-coopers the Goods, the Merchant will pay the Carrier's charge for re-coopering and will pay the freight as computed for the re-coopered Goods.

## 18. LIEN

The Carrier shall have a lien on the Goods and any document relating to the Goods or any other Goods, documents or property of the Merchant for any amount due the Carrier plus interest and the cost of collecting that amount with interest on those costs.

The costs of collecting the amount due will include, but will not be limited to, attorney and other legal fees.

## 19. GENERAL AVERAGE AND SALVAGE

General Average is to be adjusted at any port or place at the Carrier's option and is to be settled according to the York-Antwerp Rules 1994, and amendments. In the event the venture is placed in peril from any cause, even the negligence or other fault of the Carrier, for which, or for the consequences of which, the Carrier is not liable by reason of statute, law, treaty, convention, contract, or otherwise, the Merchant shall contribute with the Carrier in General Average according to the Statement prepared by the General Average Adjuster. The parties to this bill of lading agree to accept as binding the decisions of the General Average Adjuster as set forth in the Statement, and agree that the General Average Adjuster or the Carrier may exercise a lien against the Goods for General Average or Salvage.

The Merchant shall provide such security and payments on account as are requested by the

General Average Adjuster within 30 days of such request. The Merchant agrees to provide such security and to make payments on account before or after the Goods have been delivered from the Carrier. The Merchant agrees that if the Goods have been delivered, or are otherwise not available for the purpose of executing a lien against them, the Carrier may obtain such security and payments on account by exercising a lien against any other property owned by the Merchant.

The Merchant shall also pay salvage and special charges incurred in respect of the Goods. If a salvaging vessel is owned operated, or chartered by the Carrier, salvage shall be paid as fully and in the same manner as if such salvaging vessel belonged to strangers. The Merchant hereby appoints the Carrier to act on behalf of the Merchant in any salvage proceeding in which the Merchant does not appear.

## 20. BOTH TO BLAME COLLISION CLAUSE

If a vessel on which the Goods are being carried collides with another vessel as the result of the negligence or fault of both vessels, the Merchant collects payment for loss or damage to the Goods from the other vessel, and the other vessel obtains a contribution toward that damage payment from the Carrier, the Merchant will reimburse the Carrier for that contribution.

## 21. DELAY AND CONSEQUENTIAL DAMAGE

The Carrier is not responsible for consequential damages unless the carrier has agreed in writing to be responsible for the certain, specific damage that occurred.

The Carrier does not agree to deliver the Goods at any particular time or for any particular market and thus is not responsible for damages alleged to have been caused by delay.   If, despite the foregoing provision, the Carrier is held liable for damages attributable to delay, those damages are limited to the total amount payable as freight for all of the Goods shipped under the bill of lading that included the delayed Goods.

## 22. DECK STOWAGE

The Carrier or vessel owner or operator, not the Merchant, has sole authority and responsibility to determine the stowage location of the Goods on vessels that carry the Goods.   Goods stowed either by the Merchant or the Carrier in Containers, or are otherwise protected from the weather, are likely to be stowed on deck.   This bill of lading will not be claused to indicate such deck stowage, and the Hague/Visby Rules, U.S. COGSA, or Australian COGSA or New Zealand Act, whichever applies to this bill of lading, shall apply to such deck cargo as if it were stowed below deck.

Goods that are customarily carried on deck, may be carried on deck without notice to the

Merchant and at the Goods' and the Merchant's risk.

Goods not customarily carried on deck may be carried on deck at the risk of the Goods and the Merchant with the agreement of the Shipper if the bill of lading is claused to note that the Goods are carried on deck at the risk of the Goods or the Merchant.

## 23. SPECIAL VENTILATION, REFRIGERATION OR HEATING

Special ventilation, refrigeration or heat will not be furnished to the Goods unless such special service is contracted for on the face of the bill of lading and extra freight is paid.

The Merchant is responsible for inspecting each Container to determine whether it is fit to carry the Goods.  The Merchant is also responsible to assure that the Goods are at the proper temperature before they are loaded into a refrigerated Container.  The Merchant agrees to determine that the refrigeration equipment is set to the proper temperature, and that the Container is at the proper temperature before the Goods are loaded into the Container.

The Carrier is not responsible for heating, ventilating or refrigerating equipment when the equipment is not within its custody and control.

## 24. STEEL, OTHER METAL CARGO, LUMBER AND WOOD

Acknowledgement of receipt of steel, other metal cargo, lumber and wood in apparent, external, good order and condition in this bill of lading is not a representation by the Carrier that conditions of rust, oxidation or wetting and the like did not exist on receipt of such Goods by the Carrier.  It is agreed that superficial rust, white rust, oxidation, wetness or any like condition is not a condition of damage to steel and other metal cargo.  It is also agreed that wetting of lumber and wood is not a condition of damage.

If the Merchant requests in writing before delivery of such Goods to the Carrier and if a higher freight is paid, the Carrier will, after a special survey of the Goods, issue a bill of lading describing superficial rust, white rust, oxidation or wetness on such Goods.

## 25. FIRE

Neither the Carrier nor any party participating in the performance of the contracts of carriage evidenced by this bill of lading is liable for any loss or damage caused by fire unless such fire or the failure properly to extinguish it was caused by the actual fault or privity of the Carrier.

## 26. SEPARABILITY OF TERMS

The terms of this bill of lading shall be separable and if any provision or this bill of lading or any part of any provision is held to be invalid or unenforceable, such holding shall not affect the validity or enforceability of any other provision or part of this bill of lading.